# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

KEVIN S. and CHRIS W., children, by Bette
Fleishman, their Next Friend; JENNIFER H., a
child, by Liz McGrath, her Next Friend;
DIANA D., a child, by Ernestina R. Cruz, her
Next Friend; BRIAN J., a child, by Matthew
Bernstein, his Next Friend; ELLIOT J. and
MICHAEL J., children, by Feliz Rael, their
Next Friend; OLIVIA L., a child, by Georgia
Berrenberg, her Next Friend; MATTY B.,
JUSTIN B., and JACKSON B., children, by
Gabrielle Valdez, their Next Friend; LUCAS
M. and JULIAN M., children, by Mariel
Willow, their Next Friend; DAVID G., a child,
by Heidi Todacheene, his Next Friend; on
behalf of themselves and all others similarly
situated; DISABILITY RIGHTS NEW
MEXICO; and NATIVE AMERICAN
DISABILITY LAW CENTER,

                    *Plaintiffs*,

      v.

MONIQUE JACOBSON, in her official
capacity as Secretary for the Children, Youth
and Families Department, and BRENT
EARNEST, in his official capacity as
Secretary for the Human Services Department,

                    *Defendants*.

Civ. Action No. 1:18-cv-00896

1

## AMENDED COMPLAINT

1.     This action is brought by fourteen foster children[1] and by non-profit organizations Disability Rights New Mexico and Native American Disability Law Center on behalf of a class of trauma-impacted children in the custody of New Mexico's child welfare system (collectively, "Plaintiffs") against the state officials responsible for administering and supervising New Mexico's systems for child welfare and delivery of Medicaid services to eligible children ("Defendants").

2.     New Mexico has profoundly and consistently failed to fulfill the federal legal obligations it owes to the foster children entrusted to its care, with tragic and enduring consequences for the health, safety, and life chances of a generation of the nation's most vulnerable children.[2] Numerous federal and state laws reflect and enforce the long-settled determination that when a child is unsafe in his or her home, the state has an obligation to step in and provide what all children need to succeed and thrive: a safe and stable place to live and the necessary support and services to meet their medical, mental health, and behavioral needs. But New Mexico's broken system of child welfare fails to provide the stability and support that children in state custody need to be safe and healthy, locking New Mexico's foster children into a vicious cycle of declining physical, mental and behavioral health and increasingly inappropriate, restrictive, and punitive placements and treatment.

---

[1] Plaintiffs are minor children and are referred to in this Complaint by pseudonyms. Plaintiffs have concurrently filed a Motion to Proceed Using Fictitious Names.

[2] *See, e.g.*, Annie E. Casey Foundation, 2018 Kids Count Data Book at 21, *available at* http://www.aecf.org/m/resourcedoc/aecf-2018kidscountdatabook-2018.pdf (ranking New Mexico last in overall childhood well-being). The phrase "foster children" is used in this complaint to refer to children in the legal custody of New Mexico's Children, Youth and Families Department due to allegations of abuse, neglect, or abandonment pursuant to NMSA 1978 § 32A-4-1 *et seq*.

3.     New Mexico's system of child welfare has repeatedly failed federal audits, has consistently fallen short of national, research-based standards for adequate levels of staffing, and is among the worst in the nation. Its most glaring structural deficiencies fall into three inter-connected areas:

4.     **First,** because New Mexico lacks a system to ensure stable placement in safe and supportive home environments, foster children are routinely cycled through numerous short-term emergency shelters,[3] foster placements,[4] residential treatment facilities,[5] hospitals—even overnights in state government offices—that are inappropriate, overly restrictive, and lack the

---

[3] Emergency crisis centers, also known as homeless shelters for the general youth population, are meant to be short-term placements (no more than 90 days) until a long-term solution can be arranged. Emergency crisis centers house foster children, along with homeless non-foster children, some in a dorm-room setting, usually with two or three youth to a room, where the youth are free to come and go, subject to curfews. In practice, CYFD will cycle children through multiple successive crisis centers throughout the state and away from their schools and communities in an attempt to circumvent the 90-day limit, using these shelters as placements of first resort.

[4] Treatment foster care (also referred to as therapeutic foster care) is a Medicaid funded placement designed to provide therapeutic care in a structured home environment, with treatment families who have specialized training to care for children and youth with significant emotional, behavioral, or social issues or medical needs. U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, CHILD WELFARE INFORMATION GATEWAY, TREATMENT FOSTER CARE, https://www.childwelfare.gov/topics/outofhome/foster-care/treat-foster/. In practice, however, New Mexico's treatment foster parents often do not receive sufficient training to meet their foster placements' needs. Moreover, treatment foster care is a Medicaid service that requires a finding of medical necessity. Hence by its nature, treatment foster care necessarily is a short-term placement designed to address a specific need and children must be discharged when the child no longer needs that level of care.

[5] Residential treatment centers are high-cost placements paid for by Medicaid for foster children with significant mental illnesses or behavioral problems and provide inpatient therapeutic services in an institutional setting that the youth are not permitted to leave. Like treatment foster care, residential treatment centers require a medical necessity determination. While treatment foster care and residential treatment centers both were designed to treat particular mental health and behavioral conditions in therapeutic settings, they function in practice as increasingly punitive housing facilities for foster children who have experienced challenges in less-restrictive placements, regardless of true medical necessity. In other words, if a youth "acts out" in a regular foster home, he or she will be sent to a treatment foster care facility. If the youth then "acts out" in treatment foster care, he or she will be sent to a residential treatment facility, without a medical determination to confirm such placement is appropriate.

support and capacity to meet the individual needs of the children placed there. Moreover, defaulting to placements in institutional settings such as shelters, residential treatment centers, and hospitals denies foster children the opportunity to develop sustaining relationships with stable, adult caretakers as surrogate parents. In an approximately two-year period, for example, Plaintiff Diana D. has been repeatedly transferred among at least eleven short-term, inappropriate and unsafe placements, including emergency crisis shelters, treatment foster care, residential treatment facilities, and multiple psychiatric hospitals. This grim pattern is the inevitable consequence of the New Mexico Children Youth and Family Department ("CYFD") and the New Mexico Human Services Department's ("HSD") failure to recruit, license, train, and support sufficient numbers of appropriate foster care placements and its failure to hire, train, and support staff and service providers in sufficient numbers and with appropriate expertise. CYFD's and HSD's failure to maintain a system to ensure appropriate placements prevents children from developing stable bonds with a caretaker; interrupts delivery of medical, mental, and behavioral health care; and disrupts school attendance and educational attainment. In sum, Defendants' failures harm the health, well-being, and life chances of foster children.

5. ***Second,*** because New Mexico lacks a functioning system to meet the medical, mental health, and behavioral needs of children in state custody, these children are likewise denied access to necessary services, including the federally mandated medical, mental health, and behavioral health screenings and services provided by New Mexico's Medicaid program to which virtually all such children are entitled. CYFD and HSD must evaluate a child's health within thirty days of entering state custody and ensure a coordinated and integrated system of care in the least restrictive environment. 42 U.S.C. § 622(b)(2). But children languish in state custody without receiving appropriate screening, much less appropriate or consistent services.  For example,

4

Plaintiff David G. was not provided an appropriate psychological evaluation or care coordinator until he had been in CYFD custody for more than two years. During this time, he was repeatedly prescribed inappropriate psychotropic medication, requiring him to be taken to the emergency room on at least two occasions. CYFD's and HSD's failure to implement a system capable of promptly screening, diagnosing, and providing a spectrum of appropriate, consistent therapeutic services in a community setting causes notable deterioration of the physical, mental, and behavioral health of children in state custody, leading to unnecessary placement in residential facilities, often out of state, that—as CYFD and HSD have stated—are costly to the state and have not been shown to be effective.[6]

6.      These systemic deficiencies are particularly devastating and legally indefensible because the very purpose of the state's system of child welfare is to serve children who have been entrusted to state custody due to their experience with tragic traumas such as child abuse, abandonment, and neglect.

7.      **Third,** because New Mexico's child welfare system has failed to implement trauma-sensitive practices, children in state custody are unable to access even the limited services that are available. CYFD and HSD know that New Mexico foster children are highly likely to have experienced complex trauma, a term that describes children's exposure to multiple, persistent sources of adversity, violence, and loss, as well as the impact of this exposure. Every child entering the child welfare system has, at minimum, experienced the trauma of child abuse, abandonment, or

---

[6] Results First: Children's Behavioral Health, presented to the N.M. Legislative Finance Committee June 7, 2017, at 33 (hereinafter "Results First"), https://www.nmlegis.gov/Entity/LFC/Documents/ Results_First/Results%20First%20Children%27s%20Behavioral%20Health.pdf. For example, CYFD and HSD reported that New Mexico spends $68 million a year to treat the five most expensive child behavioral health disorders. Estimates show that New Mexico loses $8 billion in lifetime earnings for children currently affected by substance abuse and psychological disorders.

neglect, and separation from a caregiver. As the experiences of the individual Plaintiffs reflect, the traumas to which youth in the foster system are subjected include, but are not limited to, physical, emotional, and sexual abuse; emotional and physical neglect; homelessness; the death, incarceration, or deportation of a parent; domestic violence; and parental substance abuse, mental illness, or involvement in sex work.

8.      Publicly available data show that foster children in New Mexico are particularly likely to have experienced multiple forms of trauma prior to entering state custody. New Mexico has the highest rate of childhood trauma exposure in the country, with 18% of all children in the state having experienced three or more significant traumatic experiences.[7] New Mexico has repeatedly been ranked last in the country in overall child well-being and currently has the nation's highest rate of child poverty.[8]

9.      Medical and social science have firmly established that such exposure to complex trauma significantly impacts brain activity, function, and development, particularly in the developing brain of a child or young person. When unaddressed, the neurobiological effects of trauma exposure often result in predictable changes to numerous essential functions and life activities including behavior, emotional self-regulation, concentration, sleep, and cognition. Children and young people in state custody who are affected by trauma require accommodations in the form of system-wide, trauma-sensitive policies and practices in order to access the child welfare and Medicaid services and benefits to which they are entitled. As administrators of state agencies charged with protecting the health and safety of children who have experienced abuse,

---

[7] *The Prevalence of Adverse Childhood Experiences, Nationally, By State, and By Race or Ethnicity*, CHILD TRENDS, Feb. 12, 2018, https://www.childtrends.org/publications/prevalence-adverse-childhood-experiences-nationally-state-race-ethnicity.
[8] 2018 Kids Count Data Book, *supra* note 2, at 21, 26.

abandonment, and neglect, CYFD and HSD have an obligation to establish and maintain a system of care that anticipates and is capable of meeting the needs of the children for whom the system is built. But New Mexico's fractured system of child welfare lacks even the rudimentary elements of a trauma-informed system of care, elements that are necessary to ensure meaningful access to appropriate placements and delivery of medical, mental, and behavioral health services.

10.     Worse yet, New Mexico's child welfare practices systematically re-traumatize vulnerable children. The predictable result of New Mexico's failure to recruit an adequate number of foster care parents has been to subject children to a series of temporary placements in which any bonds they can form with caregivers are promptly broken. Inadequate placement options result in children being situated in overly restrictive environments, where they may suffer additional trauma from the effects of restraint, seclusion, or even violence. Compounding the trauma, New Mexico has failed to adequately train its staff and foster parents on childhood trauma or to help them in dealing with the secondary trauma that they themselves often suffer. Ill-prepared to understand and respond to trauma, those on the front lines of New Mexico's child welfare system may inadvertently subject children in their care to additional trauma.

11.     Federal and state laws recognize the state's obligation to safeguard the rights, health, and well-being of children in state custody who, by definition, have no parent or guardian capable of advocating on their behalf. Yet CYFD and HSD have repeatedly shown disregard for and deliberate indifference to this fundamental duty, at tragic cost to the health, well-being, and life chances of the children in CYFD custody.

a. For children who have experienced complex trauma that substantially limits major life activities, **Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act ("ADA")** require CYFD and HSD to ensure

meaningful access to the public benefits, including the child welfare and Medical benefits, to which these children are entitled. Yet CYFD and HSD operate systems that fail to reasonably accommodate the impact of complex trauma, and even re-traumatize children and inflict further harm.

b. To provide meaningful access to the child welfare system and the state's Medicaid program, CYFD and HSD must have a system for addressing the needs of children with disabilities who are impacted by complex trauma by providing trauma-sensitive approaches and training that have been shown to mitigate the effects of trauma. CYFD and HSD must also avoid repeated transfers of children among inappropriate facilities. These transfers subject children to new traumas, worsen their conditions, and further limit their ability to access the foster care and Medicaid systems. CYFD and HSD must also offer adequate medical, mental, and behavioral health screening, treatment, and monitoring to avoid exacerbating the effects of past trauma (including any trauma resulting from CYFD's or HSD's own acts) in order for these children to have meaningful access to the state's foster care and Medicaid services.

c. Section 504 of the Rehabilitation Act and Title II of the ADA also require that children be placed in the most integrated setting appropriate to their needs. But CYFD and HSD frequently violate this requirement by administering a system that places children in unduly restrictive residential treatment facilities rather than appropriate community-based placements.

d. **The Fourteenth Amendment's Substantive Due Process Clause** imposes a duty on state officials to keep children in foster care reasonably safe from harm.

Instead, CYFD's and HSD's failure to implement a trauma-informed system that ensures appropriate placements and delivery of medical, mental health, and behavioral health services threatens the health, safety, and welfare of children in CYFD's and HSD's custody.

e. **The Medicaid Act**, 42 U.S.C. § 1396 *et seq.*, requires HSD, as the single state agency designated to administer New Mexico's Medicaid program, to arrange for early screening and diagnostic services that would determine the existence of physical or mental illnesses or behavioral health conditions, to do so with reasonable promptness, to arrange for necessary medical, mental, and behavioral health services, and to inform eligible children of these available services. But CYFD and HSD have failed to create a system of care capable of assessing the needs of children in the child welfare system and delivering appropriate services.

f. **The Indian Child Welfare Act** ("ICWA"), 25 U.S.C. § 1915(a), (b), sets forth standards to meet the needs of children covered by ICWA, including that Native children in foster care be placed in the least restrictive setting that approximates a family and that they receive placements consistent with ICWA's placement preferences. 25 U.S.C. 1915(b). But CYFD and HSD have failed to maintain a system capable of complying with these ICWA obligations, resulting in, among other problems, the cycling of Native children in custody through multiple, non-preferred placements.

12.     CYFD and HSD know that their broken child welfare system is inflicting harm on the children in its care, and they also know how to fix it. Section VII of this Complaint catalogues repeated acknowledgments by CYFD and HSD that New Mexico's system of child welfare is

failing to meet the needs of children in its custody, failing to meet federal standards, deteriorating in performance, and causing devastating harm to foster children across the state.

13. CYFD and HSD have also acknowledged that evidence-based, high-quality solutions are available; namely, a trauma-informed system of care capable of supporting and healing foster children who have experienced abuse, abandonment, and neglect. Experts agree that such a system must include the following core elements: (1) building human capital, including sufficient numbers of case workers, foster parents, and mental health professionals with appropriate expertise and training; (2) screening for trauma and prompt provision of appropriate, adequate, and coordinated medical, mental health, and behavioral health services; (3) monitoring a child's health and treatment; (4) ensuring appropriate placements and placement supports; and (5) implementing a wraparound model that facilitates collaboration among parties responsible for care and service provision, an individualized planning process for each child, and a focus on sustaining relationships.

14. Because New Mexico has failed to comply with its statutory and constitutional obligations, and because that failure has inflicted enormous harm on the Plaintiff-children and other children who are similarly situated, Plaintiffs respectfully pray that this Court order implementation of a trauma-informed care system for New Mexico's trauma-impacted foster care children.

## PARTIES

A.      **Plaintiffs**

15. Plaintiffs are fourteen foster children and non-profit organizations Disability Rights New Mexico and Native American Disability Law Center. They bring this case on behalf of a class of trauma-impacted children currently in the custody of New Mexico's child welfare system to

ensure that New Mexico's state officials responsible for administering the child welfare system fulfill their federal legal obligations.

16.     **Plaintiff Kevin S.** is a Latino fourteen-year-old from Bernalillo County. He entered CYFD custody in 2009 due to physical abuse, sexual abuse, and neglect. Kevin S. returned to his mother's custody in 2013. In 2016, his mother requested he be placed back in CYFD custody. Kevin S.'s mother was previously missing and is not a consistent presence in Kevin S.'s life. Kevin S. likes skateboarding, riding his bike, and listening to all kinds of music, including rap and country. Kevin S. wants to attend college, where he hopes to play basketball or football.

17.     Kevin S. is enrolled in Medicaid.

18.     Kevin S. has experienced multiple forms of trauma, including repeated childhood sexual abuse by his mothers' partners, physical abuse, exposure to domestic violence, neglect, and separation from a caregiver.

19.     Kevin S. has been diagnosed with post-traumatic stress disorder, bipolar I, insomnia, attention deficit hyperactivity disorder, reactive attachment disorder, disruptive mood dysregulation disorder, borderline intellectual functioning, and learning disorders. Kevin S. has difficulty making decisions, planning, communicating, focusing, sleeping, understanding cues and communications from others, and sitting still. As a result of his exposure to repeated and sustained trauma, Kevin S. sometimes experiences behavioral challenges, such as periodic outbursts.

20.     Despite his diagnoses and exposure to repeated and sustained trauma, Kevin S. has not received adequate mental and behavioral health services to which he is entitled through Medicaid while in CYFD custody. From 2009 to 2013, Kevin S. received insufficient services and treatment, and his behavioral challenges have continued to escalate. In 2013, Kevin S. was returned

11

to his mother who, unable to manage his escalating behavior, sent him to a residential treatment center in Texas for two years. Since he reentered CYFD custody in 2016, he has continued to receive insufficient treatment. Across placements, he has received only phone counseling with his mother, inadequate counseling, or no counseling at all.

21.     CYFD has cycled Kevin S. through at least eleven placements during his two times in state custody. When he entered the child welfare system for the second time in September 2016, at age twelve, Kevin S. was placed in an emergency youth shelter for ages sixteen to twenty-one for approximately one week. After that, he spent two nights sleeping in the CYFD office, which has neither a formal sleeping space nor a shower. Due to the fact that CYFD staff are not equipped to securely monitor children in the office overnight, Kevin S. was able to run away and was found dodging in and out of traffic. CYFD then sent Kevin S. to a residential treatment center in Colorado, where he was repeatedly harmed by both staff and other residents. Kevin S. was restrained multiple times a week for substantial periods of time, sometimes for an entire hour, by staff. He was also repeatedly harmed by other children at the center, including receiving black eyes and other facial wounds. Even though CYFD received multiple incident reports detailing how Kevin S. had been repeatedly harmed by both staff and other residents, CYFD kept him at this placement for a year. Due to CYFD's inability to secure a single placement in New Mexico, CYFD subsequently sent Kevin S. to another out-of-state residential treatment center in Utah. Since Kevin S. arrived at the Utah facility in September of 2017, he has been cycled through three different facilities within the center. Even though Kevin S. has been in this placement for months, his CYFD Permanency Planning Worker has still not visited him.

22.     Kevin S. brings this action through his Next Friend Bette Fleishman.

23.     **Plaintiff Chris W.** is an African-American fourteen-year-old from Torrance County. He entered CYFD custody in April 2016 when his mom died of asthma. Chris W.'s father has been in and out of prison and is currently incarcerated. He loves boxing and playing musical instruments. His goal is to be reunited with his two brothers and to have a home.

24.     Chris W. is enrolled in Medicaid.

25.     Chris W. has experienced multiple forms of trauma, including the death of a parent, incarceration of a parent, parental substance abuse, and separation from a caregiver.

26.     Chris W. sometimes experiences behavioral challenges, including outbursts. Chris W. has difficulty making decisions, planning, communicating, focusing, sleeping, and understanding cues and communications from others. He has been diagnosed with post-traumatic stress disorder, behavioral dysregulation, oppositional defiant disorder, intermittent explosive disorder, and additional trauma-related disorders, among other diagnoses.

27.     Despite his exposure to repeated and sustained trauma and his diagnoses, Chris W. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Chris W. did not receive any individual therapy until he had been in CYFD custody for nearly four months. Two years into custody, Chris W. has still not been provided with grief counseling, even though he was very close to his mother and her death was the cause of his entry into CYFD custody.

28.     CYFD has cycled Chris W. through at least nine placements in the two years since he entered CYFD's custody. Chris W. and his two brothers were initially placed together with a foster family in Edgewood, but when CYFD and HSD failed to provide any supports for his foster parents, they requested that Chris W. be removed. CYFD separated Chris W. from his siblings and cycled him through several placements, including another foster home, multiple short-term shelters,

and a residential treatment center. Chris W. stayed at the residential treatment center for only a few months and was provided with inadequate services. He was blamed for his lack of response to inadequate services, repeatedly restrained, and forced to move from one section of the center to another almost every night for months. In the two months after he left the residential treatment center, Chris W. was cycled through four placements, including multiple short-term youth shelters in Taos and Albuquerque and a treatment foster home in Las Cruces. When the treatment foster home notified CYFD that it was going to discharge Chris W. due to behavioral issues, CYFD could not identify a single placement in New Mexico that would accept Chris W. Chris W. ran away and went missing for nearly a month. After Chris W. was found, only one placement in New Mexico, a residential treatment center in Albuquerque, accepted his application for placement. Within a month he was thrown out of that facility, housed in a juvenile detention center and is currently out of state in a treatment center in Arizona.

29.     Chris W. brings this action through his Next Friend Bette Fleishman.

30.     **Plaintiff Jennifer H.** is a bi-racial 17-year-old from Socorro County who first entered CYFD custody in May of 2014 due to emotional abuse by her grandmother. In August of 2014, Jennifer H. was returned to her grandmother, who then asked that she be placed back in CYFD custody in September of 2016. Jennifer H.'s father is deceased, and her mother does not have a consistent presence in Jennifer H.'s life.

31.     Jennifer H. is enrolled in Medicaid.

32.     Jennifer H. has experienced multiple forms of trauma, including emotional abuse, alleged sexual abuse, death of a parent, and separation from a caregiver.

33.     Jennifer H. sometimes experiences behavioral challenges, including running away. Jennifer H. has difficulty making decisions, planning, communicating, focusing, sleeping, and

understanding cues and communications from others. She has been diagnosed with post-traumatic stress disorder, depression, anxiety, and oppositional defiant disorder.

34.    Despite her exposure to repeated and sustained trauma and her diagnoses, Jennifer H. has not received adequate medical, mental, and behavioral health services to which she is entitled through Medicaid while in CYFD custody. Although a psychological evaluation stated that she needed targeted analytic behavior therapy and structured peer interactions, CYFD has repeatedly placed her in unstructured environments that have resulted in her running away. Jennifer H.'s therapist indicated that she needs an attachment model and trauma-informed services.

35.    CYFD has cycled Jennifer H. through at least nine placements since she entered CYFD custody in 2016, including a shelter and multiple residential treatment centers, treatment foster care placements, multiple foster homes, and children's psychiatric centers. In one foster home, Jennifer H. alleged she was the victim of sexual abuse from her foster father. After she alleged sexual abuse, CYFD was unable to identify a single placement that would accept Jennifer H. CYFD's "solution" was to remove Jennifer H. from New Mexico and send her to a residential treatment center approximately one thousand miles away in Missouri. By cycling Jennifer H. through numerous facilities and ultimately transferring her across the country, CYFD and HSD have prevented Jennifer H. from receiving consistent care or forming a stable relationship with a therapist or foster parent, and have inflicted additional trauma on Jennifer H.

36.    Jennifer H. brings this action through her Next Friend Liz McGrath.

37.    **Plaintiff Diana D.** is a sixteen-year-old from San Juan County who is enrolled with the Navajo Nation. She is a child covered by the Indian Child Welfare Act ("ICWA"). In particular, because Diana D. is enrolled with the Navajo Nation, she meets the definition of an "Indian child" under ICWA. *See* 25 U.S.C. § 1903(4).

38.     For most of Diana D.'s life, her mother has struggled with substance abuse and chronic homelessness. As a result, Diana D. has spent much of her life in a shelter for homeless youth in Farmington, New Mexico. Diana D. entered CYFD custody in 2016. Diana D.'s mother reportedly continues to struggle with substance abuse and homelessness. Her father has been absent most of her life and his location is unknown. Diana D. enjoys watching movies, playing the clarinet, drawing, writing poetry, and reading mystery books.

39.     Diana D. is enrolled in Medicaid.

40.     Diana D. has experienced multiple forms of trauma, including substance abuse and neglect by her mother, sexual abuse by an older brother, chronic homelessness, consistent bullying at school, and separation from a caregiver.

41.     As a result of the repeated and sustained trauma that Diana D. has experienced, Diana D. has trouble regulating her emotions, making decisions, focusing, interpreting cues from others, sleeping, eating, accepting change, and forming trusting relationships with peers or adults. Diana D. has difficulty focusing because she frequently ruminates on the neglect she experienced growing up as well as her mother's substance abuse and homelessness. She feels guilt and shame that her two older sisters had to care for her because of their absent mother, and she blames herself for her siblings' entry into CYFD custody. She has great difficulty communicating about her experiences with abuse and neglect and sometimes denies them. During her time in CYFD custody, Diana D. has been diagnosed with post-traumatic stress disorder, disruptive mood dysregulation disorder, recurrent major depressive disorder with severe psychotic symptoms, bipolar 1, an eating disorder, complex neurodevelopmental trauma, and borderline personality traits. A recent neuropsychological evaluation suggested that Diana D. may have schizoaffective disorder, although her current treating psychiatrist has ruled the disorder out at this time due to her age and the complex

16

trauma she has experienced. As of November 2018, her residential treatment center said her current

diagnoses are: PTSD and recurrent major depressive disorder with severe psychotic symptoms.

42.     Despite her diagnoses and exposure to repeated and sustained trauma, Diana D. has

not received adequate medical, mental, and behavioral health services to which she is entitled

through Medicaid while in CYFD custody. She did not receive any services until she had been in

CYFD custody for over a month, and she waited over a year and a half for a neuropsychological

evaluation. She finally received the neuropsychological evaluation in May 2018. Nor has Diana D.

been provided with continuity of care; despite her known serious emotional and mental health

needs, Diana D. has gone weeks at a time without any services, and had three different therapists

within the first two months of her most recent residential treatment center placement. Within a one-

year period, she has been prescribed at least nine different psychiatric medications by physicians at

six placements and additional medications to address medication-induced symptoms, including

Cogentin for medication-induced tics. Currently, Diana D. is taking Wellbutrin for depression and

mood, Seroquel for PTSD and mood, Prazosin for PTSD and nightmares, Miralax and a multi-

vitamin. Diana D. recently asked for an increase in her Prazosin to help her sleep because her

nightmares are worsening.

43.     Since Diana D. entered CYFD custody in October 2016, CYFD has cycled her

through at least eleven placements, including a crisis shelter, various hospitals, a treatment foster

care, and residential treatment centers. In violation of ICWA's list of preferential placements, none

of CYFD's placements for Diana D. have been with a Navajo foster family or other Native

American care provider. In November 2018, Diana D. was discharged from a residential treatment

center to a treatment foster care placement.  Although Diana D. expressed her wish to be placed in

a community setting, due to the lack of available community-based placements she was instead

placed into treatment foster care. Diana D.'s treatment foster care placement is a short-term placement that is only available to her as long as it is deemed medically necessary. Diana D. previously resided in this treatment foster care placement from March 3, 2017 to June 5, 2017, when the placement was disrupted after, due to inappropriate supervision, Diana D. ingested an unknown substance, and held a knife to herself.

44.     Due to CYFD's failure to provide stability and appropriate medical, mental, and behavioral health services to which she is entitled through Medicaid, Diana D.'s mental health has notably deteriorated. When Diana D. entered CYFD custody, she cracked jokes, enjoyed socializing, was open and communicative with her Youth Attorney and participated actively in team treatment meetings. After nearly two years in CYFD custody, Diana D. is mostly uncommunicative in team treatment meetings, avoids speaking of her past, and has conveyed that she does not want to participate in or receive updates about in-person or telephonic court hearings. Due to the failure to address the impact of trauma on Diana D.'s health, she has experienced behavioral challenges which have resulted in her removal from placements and further disruption of her medical, mental, and behavioral health services. This has prevented her from forming a stable relationship with a foster parent.

45.     Diana D. also has not received adequate, continuous, and timely dental care. Diana D. received braces when she was first placed in Albuquerque, but when she was moved to Farmington, she was not provided an orthodontist. As a result, Diana D. suffered from broken braces cutting her mouth for over six months. To date, upon information and belief, Diana D. has only seen the orthodontist twice; her residential treatment center failed to transport her for one appointment and took her to the wrong provider on another occasion. Diana D. only recently saw her orthodontist to get her upper braces maintained.

46.     Due to multiple placements, placements with inadequate educational opportunities, and CYFD's failure to inform placements of Diana D.'s special education needs, Diana D.'s education has suffered. Diana D. did not earn a single high school credit for months at one of her placements, a residential treatment center. At her most recent prior placement, another residential treatment center, Diana D. was provided with limited instruction in a basement because she was not accepted into the facility's charter school, which uses a lottery system. Diana D. received 5.5 high school credits as a ninth grader. Even though this instruction was provided on the grounds of the residential treatment center, Diana D. was subject to a daily "blanket search": every day after school, she is required to strip down to her underwear behind a blanket so that her clothes can be searched before returning to her unit. In addition to being deprived of an adequate school setting, it is unclear whether Diana D. is being provided with special education services. Diana D. was previously identified as needing special education services as a student with an emotional disturbance, but CYFD had failed to ensure that Diana D. had an individualized education plan (IEP) in place. Diana D.'s November 2018 placement change in placement required her to change schools during the school year.  She is currently enrolled in the tenth grade at her local high school, but her Youth Attorney has not been informed as to whether her new school has received her IEP from her prior educational placement.

47.     Diana D. brings this action through her Next Friend Ernestina R. Cruz.

48.     **Plaintiff Brian J.** is a Latino thirteen-year-old from Bernalillo and Valencia Counties. He entered CYFD custody in May 2017 with his two brothers after a CYFD safety plan failed to prevent them from being physically abused. His father has been incarcerated for the majority of the past ten years as a result of multiple domestic violence convictions for abusing Brian J., his brothers, and their mother. Brian J. enjoys going to the pool with his brothers and friends.

49.     Brian J. is enrolled in Medicaid.

50.     Brian J. has experienced multiple forms of trauma, including physical abuse by multiple family members, exposure to domestic violence, living with a caregiver with untreated mental health challenges, and separation from a caregiver due to incarceration.

51.     As a result of sustained and repeated exposure to trauma, Brian J. has difficulty concentrating, responding appropriately to redirection, self-regulating emotionally, and understanding and complying with directives. Brian J. has also been diagnosed with attention-deficit/hyperactivity disorder, conduct disorder, specific learning disorder (with moderate to severe impairment in reading, written expression, and arithmetic), adjustment disorder with anxiety, sibling relational problems, and borderline intellectual functioning.

52.     Despite his exposure to repeated and sustained trauma and his diagnoses, Brian J. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Brian J. did not receive a comprehensive psychological evaluation until he had been in custody for eleven months. This evaluation recommended that Brian J. meet with a child psychiatrist for a medication evaluation, but none has been provided. The only mental health support that Brian J. received during his entire first year in CYFD custody was a few weeks of therapy that Brian J.'s aunt secured without the assistance of CYFD. CYFD failed to follow up on Brian J.'s needed services and he was not re-enrolled in counseling for several months.

53.     CYFD has cycled Brian J. through five placements since he entered CYFD custody approximately sixteen months ago. Due to the absence of placements in Brian J.'s hometown, he and his brothers were first sent to a foster home approximately one hour away. After three weeks, with no prior notice to their Guardian ad Litem, the brothers were moved over two hundred miles away to a youth shelter in Farmington, New Mexico, where they stayed for approximately three

weeks. Due to CYFD's failure to secure a placement closer to the boys' mother and failure to provide adequate transportation, they were unable to have any visits with their mother while they stayed in Farmington. CYFD then placed the boys with their paternal aunt near the first foster placement. Because Brian J. did not receive adequate mental or behavioral health services and his aunt did not receive adequate foster parent support, his aunt requested multiple times that Brian J. be removed on an emergency basis. Due to CYFD's delay in appropriately responding to this request and failure to identify any appropriate and safe alternative placement, CYFD separated Brian J. from his siblings and placed him with his mother in Valencia County, over the objection of his Guardian ad Litem that this placement would be detrimental to Brian J.'s safety and well-being. While Brian J. was placed with his mother, CYFD failed to provide Brian J. and his mother with appropriate in-home supports and family counseling services to address both of their mental health needs. After about seven weeks with his mother, Brian J. was removed again and placed in a runaway youth shelter in Albuquerque, where he stayed for ten weeks. CYFD did not identify an in-state therapeutic placement option for Brian J. He was accepted into residential treatment in Utah. With no appropriate in state therapeutic placement options, Brian J. was placed at home with his mother again.

54.    As a result of the denial of appropriate medical, mental, and behavioral health services and a stable placement while in CYFD custody, Brian J.'s behavior deteriorated. Brian J. exhibited positive behaviors at his first placement but, due to the denial of necessary services, he began to exhibit defiance, physical aggression, violent outbursts, and a lack of age-appropriate behavioral controls. Brian J.'s behavioral changes resulted in multiple school suspensions. CYFD also failed to ensure that Brian J., who has had an IEP for years, was provided special education support. For multiple months, CYFD made no attempt to determine his educational needs.

21

55.     Brian J. brings this action through his Next Friend Matthew Bernstein.

56.     **Plaintiff Elliot J.** is a Latino fourteen-year-old from Bernalillo and Valencia Counties. He entered CYFD custody in May 2017 with his two brothers after a CYFD safety plan failed to prevent them from being physically abused. His father has been incarcerated for the majority of the past ten years as a result of multiple domestic violence convictions for abusing Elliot J., his brothers, and their mother. Elliot J. enjoys going to school and his favorite subject is math.

57.     Elliot J. is enrolled in Medicaid.

58.     Elliott J. has experienced multiple forms of trauma, including physical abuse by multiple family members, exposure to domestic violence, living with a caregiver with untreated mental health challenges, and separation from a caregiver due to incarceration.

59.     As a result of sustained and repeated exposure to trauma, Elliot J. sometimes exhibits behavioral challenges, including outbursts, and he has tried to run away. Elliot J. has difficulty regulating his emotions, concentrating, staying engaged, expressing himself verbally, and exhibiting age-appropriate behavioral controls. Elliot J. has also been diagnosed with attention-deficit/hyperactivity disorder, an intellectual development disorder, language disorder with speech/language impairment, unspecified neurodevelopmental disorder, sibling relational problems, and parent-child relational problems. He takes prescribed medication for ADHD.

60.     Despite his exposure to repeated and sustained trauma and his diagnoses, Elliot J. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Elliot J. did not receive a comprehensive psychological evaluation until he had been in CYFD's custody for eleven months. The only mental health support that Elliot J. received during his entire first year in CYFD custody was a few weeks of therapy that Elliot J.'s aunt secured without the assistance of CYFD. CYFD failed to follow up on Elliot J.'s

needed services and he was not re-enrolled in counseling for four months. The new therapy was also secured by Elliot J.'s aunt without the assistance of CYFD.

61.     CYFD has cycled Elliot J. through four placements since he entered CYFD's custody in May 2017. Due to the absence of placements in Elliot J.'s hometown, he and his brothers were first sent to a foster home approximately one hour away. Due to inadequate services, support, and supervision at this placement, Elliot J. experienced significant behavioral challenges and attempted to run away. After three weeks, with no prior notice to their Guardian ad Litem, the brothers were moved over two hundred miles away to a youth shelter in Farmington, New Mexico, where they stayed for approximately three weeks. Due to CYFD's failure to secure a placement closer to the boys' mother and failure to provide adequate transportation, they were unable to have any visits with their mother while they stayed in Farmington. CYFD then placed the boys with their paternal aunt near their first foster placement. Due to insufficient support by CYFD, the paternal aunt chose to stop serving as a foster parent after ten and a half months as the brothers' placement, and Elliot J. and his brother Michael J. were removed from her home and placed back with their mother.

62.     CYFD also failed to ensure that Elliot J., who has had an IEP for years, was provided special education support. For several months, CYFD made no attempt to determine his educational needs.

63.     Elliot J. brings this action through his Next Friend Feliz Rael.

64.     **Plaintiff Michael J.** is a twelve-year-old Latino child from Bernalillo and Valencia Counties. He entered CYFD custody in May 2017 with his two brothers after a CYFD safety plan failed to prevent them from being physically abused. His father has been incarcerated for the majority of the past ten years as a result of multiple domestic violence convictions for abusing

Michael J., his brothers, and their mother. Michael J. enjoys going to school and his favorite subject is math.

65. Michael J. is enrolled in Medicaid.

66. Michael J. has experienced multiple forms of trauma, including physical abuse by multiple family members, exposure to domestic violence, living with a caregiver with untreated mental health challenges, and separation from a caregiver due to incarceration.

67. As a result of sustained and repeated exposure to trauma, Michael J. struggles with self-confidence and task-avoidance. He also avoids disclosing abuse in order to not disrupt placements. Michael J. has been diagnosed with adjustment disorder, sibling relational problems, parent-child relational problems, and specific learning disorders with impairments in written expression and arithmetic.

68. Despite his diagnoses and exposure to repeated and sustained trauma, Michael J. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Michael J. did not receive a comprehensive psychological evaluation until he had been in custody for eleven months. This evaluation noted an adequate prognosis for Michael J., if provided with "ample support and guidance." CYFD has failed to provide this. The only mental health support that Michael J. received during his entire first year in CYFD custody was a few weeks of therapy that Michael J.'s aunt secured without the assistance of CYFD. CYFD failed to follow-up on Michael J.'s needed services, and he was not re-enrolled in counseling for four months. The new therapy was also secured by Michael J.'s aunt without the assistance of CYFD.

69. CYFD has cycled Michael J. through four placements since he entered CYFD custody in May 2017. Due to the absence of placements in Michael J.'s hometown, he and his

brothers were first sent to a foster home approximately one hour away. After three weeks, with no prior notice to their Guardian ad Litem, the brothers were moved over two hundred miles away to a shelter in Farmington, New Mexico, where they stayed for approximately three weeks. Due to CYFD's failure to secure a placement closer to the boys' mother and failure to provide adequate transportation, they were unable to have any visits with their mother while they stayed in Farmington. CYFD then placed the boys with their paternal aunt near the first foster placement. Due to insufficient support by CYFD, the paternal aunt chose to stop serving as a foster parent after ten and a half months as the brothers' placement, and Michael J. and his brother Elliot J. were removed from her home and placed back with their mother.

70.     CYFD also failed to ensure that Michael J., who has had an IEP for years, was provided special education support, and CYFD made no attempt to determine his educational needs for several months.

71.     Michael J. brings this action through his Next Friend Feliz Rael.

72.     **Plaintiff Olivia L.** is a thirteen-year-old Hispanic child from Bernalillo County. She entered CYFD custody for the second time in 2016 due to sexual abuse by her mother's partners and physical abuse and neglect by her mother. Olivia L. and her twin also were in CYFD custody in 2012. Her father is deceased. Olivia L. and her three siblings are all in CYFD custody.

73.     Olivia L. is enrolled in Medicaid.

74.     Olivia L. has experienced multiple forms of trauma, including sexual and physical abuse, multiple rapes, neglect, death of a parent and separation from caregivers.

75.     As a result of repeated and sustained trauma, Olivia L. experiences severe and chronic flashbacks and self-harming behaviors, including cutting. Olivia L. has difficulty sleeping and frequently wakes up in the middle of the night crying. She also has difficulty making decisions,

concentrating, regulating her emotions and behavior, interpreting cues from others, and making age-appropriate judgments. Olivia L. has been diagnosed with depression, post-traumatic stress disorder, and reactive attachment disorder.

76.     Despite her exposure to repeated and sustained trauma and her diagnoses, Olivia L. has not received adequate medical, mental, and behavioral health services to which she is entitled through Medicaid while in CYFD custody.

77.     Since Olivia L. reentered CYFD custody in August 2016, CYFD has cycled her through seven placements, including a treatment foster care placement, psychiatric hospital, relative placement, multiple short-term shelters, and a residential treatment center. CYFD first placed Olivia L. in a treatment foster care placement from August 2016 to March 2017. CYFD removed Olivia L. when she was found cutting herself and using substances and sent her to a psychiatric hospital for acute care, where she stayed for several months. While living at the hospital, Olivia L. only received one or two sessions of family therapy before she was discharged to her aunt. Olivia L.'s aunt repeatedly requested support services from CYFD but received none. After less than one month, Olivia L.'s aunt requested that she be removed. Olivia L. was then cycled through multiple short-term shelters, where she was raped by two adults. CYFD then placed Olivia L. in a residential treatment center. Olivia L. was transferred to treatment foster care in April 2018 but refused to enter the placement and instead stayed briefly with her biological mother. CYFD was notified of Olivia L.'s location and eventually placed her in a shelter over 300 miles from Albuquerque, where she stayed for over one month. CYFD then moved Olivia L. to another residential treatment facility in Albuquerque in mid-June 2018.

78.     Olivia L. brings this action through her Next Friend Georgia Berrenberg.

79.     **Plaintiff Matty B.** is a white eleven-year-old from Torrance County who entered CYFD custody with his two brothers in November 2016 due to neglect. Matty B. likes riding his bike, playing tag and Connect 4 with his brothers and friends, and flying his toy helicopter.

80.     Matty B. is enrolled in Medicaid.

81.     Matty B. has experienced multiple forms of trauma, including neglect, sexual abuse, witnessing domestic violence, witnessing the sexual abuse of his sister, living with caregivers with substance abuse and significant mental health challenges, and witnessing the death of his sister in a fire that burned down their home in May 2016.

82.     As a result of sustained and repeated exposure to trauma, Matty B. has difficulty managing anger, regulating his emotions, concentrating, accepting redirection from others, interpreting cues and communications from others, exhibiting age-appropriate sexual behavior, and recognizing personal boundaries. Matty B. experiences depressive symptoms and is easily frustrated when he struggles with school lessons, peer interactions, and extracurricular activities. He has difficulty focusing because, among other reasons, he frequently thinks about his unstable home life and his parents' substance use, and he worries about the safety of his younger brothers. Matty B. has been diagnosed with post-traumatic stress disorder, unspecified disruptive behavior disorder, sibling-relational problems, and parent-child relational problems.

83.     Despite his diagnosis and exposure to repeated and sustained trauma, Matty B. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Matty B. did not receive a neuropsychological evaluation until he had been in CYFD custody for nearly eight months. This evaluation misdiagnosed Matty B. with unspecified neurocognitive disorder and borderline intellectual functioning. Eight months later, Matty B.'s schools identified this as a misdiagnosis, determining

that Matty B. was in fact eligible for special education services due to emotional disturbance, not intellectual disability. The misdiagnosis of borderline intellectual functioning and unspecified neurocognitive disorder negatively affected Matty B.'s self-esteem, hopefulness for his future, and educational achievement.

84.     While in CYFD custody, Matty B. did not receive timely and adequate therapy to address his grief over his sister's death in the house fire, the sexual trauma he had experienced and his related sexualized behaviors, the neglect he experienced while living with his parents, or his additional behavioral challenges. Matty B. received no individual therapy until three months after he came into CYFD custody. He received family counseling that was abruptly discontinued unilaterally by the foster parent without adequate therapeutic basis, any discharge planning, or oversight by CYFD. As a result, Matty B.'s outbursts quickly returned and escalated, resulting in CYFD removing Matty B. and one of his brothers from the foster home on an emergency basis at the request of the foster mother in August 2017. Matty B. and his family did not receive court-ordered family therapy until December 2017, four months later. In April 2018, Matty B.'s therapist resigned from his treatment foster care agency, again suspending the children's family therapy sessions for approximately six weeks.

85.     CYFD has cycled Matty B. through five placements, including multiple foster homes and treatment foster care homes. Placement changes have separated Matty B. from his siblings and parents and also required changes in Matty B.'s school setting and service providers, repeatedly disrupting his relationships with peers and mental health professionals. Matty B. was placed with his two brothers in a home in Estancia due to a lack of available foster homes closer to Matty B.'s hometown. Because of CYFD's failure to provide transportation assistance, Matty B. was required to change schools and Matty B. and his brothers were unable to consistently visit with

their parents during this time. At another point, Matty B. was again separated from his siblings and sent to an emergency foster care placement for twelve days. Matty B. was then sent to a treatment foster care home in Albuquerque, nearly an hour away from his parents and again requiring a change in his school setting. Matty B.'s behavior has deteriorated as a result of CYFD's failure to provide Matty B. with stability and as a result of the denial of appropriate medical, mental, and behavioral health services to which he is entitled.

86.     Despite Matty B.'s clear academic challenges, he was not assessed for special education needs until August 2017, approximately ten months after he was initially taken into CYFD custody.

87.     Matty B. brings this action through his Next Friend Gabrielle Valdez.

88.     **Plaintiff Justin B.** is a white six-year-old from Torrance County who entered CYFD custody with his two brothers in November 2016 due to neglect.

89.      Justin B. is enrolled in Medicaid.

90.     Justin B. has experienced multiple forms of trauma, including neglect, witnessing the death of his sister in a fire that burned down his home, witnessing his parents abuse marijuana and crystal methamphetamine, witnessing domestic violence between his parents, and living with caregivers with severe mental health challenges.

91.     As a result of sustained and repeated exposure to trauma, Justin B. has difficulty concentrating, expressing his emotions, accepting redirection, and recognizing personal boundaries. Justin B. has a history of self-harming, acting impulsively, and experiencing anxiety. Justin B. has reported experiences of auditory and visual hallucinations of his deceased sister and previously claimed that she was controlling his behaviors. Justin B. blamed himself for the fire that killed his older sister, even though he was only three years old when the fire occurred. He becomes frustrated

easily when he struggles with school lessons, peer interactions, and extracurricular activities, and he has difficulty understanding the progress his parents have made in their treatment plans and trusting them to provide him safety. He has been diagnosed with post-traumatic stress disorder, disinhibited social engagement disorder, developmental delay, parent-child relational problems, and sibling relational problems. Justin B. has been prescribed medication since November 2017 for nightmares, anxiety, and self-harming behaviors.

92.     Despite Justin B.'s exposure to repeated and sustained trauma and his diagnoses, he has not received adequate mental and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Justin B. did not receive a neuropsychological evaluation until he had been in CYFD custody for nearly one year. While in CYFD custody, Justin B. did not receive timely and adequate therapy to address his grief and guilt over his sister's death in the house fire, ongoing sexualized behaviors, the neglect he experienced while living with his parents, or his overall behavioral challenges. He briefly received family counseling that was abruptly discontinued unilaterally by the foster parents without adequate therapeutic basis, discharge planning, or oversight by CYFD. As a result, Justin B.'s behavioral challenges quickly returned and escalated, resulting in CYFD removing Justin B. and one of his brothers from the foster home on an emergency basis at the request of the foster mother in August 2017. Justin B. and his family did not receive court-ordered family therapy until December 2017, four months later, and a month after the Court-ordered deadline to begin the service.

93.     CYFD has cycled Justin B. through three placements, including regular foster care, an emergency shelter, and treatment foster care. Justin B. was placed with his two brothers in a home in Estancia due to a lack of available foster homes closer to Justin B.'s hometown. Due to CYFD's failure to provide transportation assistance, Justin B. and his brothers were unable to

consistently visit with their parents during this time. As a result of the denial of appropriate medical, mental, and behavioral health services to which he is entitled through Medicaid, and the denial of a stable placement while in CYFD custody, Justin B.'s behavior deteriorated. Justin B. was separated from his siblings and sent to an emergency foster care placement for twelve days. CYFD then sent Justin B. to a treatment foster care home in Albuquerque, which is nearly an hour away from his parents, and which required a change in school.

94.     Justin B. brings this action through his Next Friend Gabrielle Valdez.

95.     **Plaintiff Jackson B.** is a white two-year-old from Torrance County who entered CYFD custody, along with his two older brothers, in November 2016 after he tested positive for methamphetamine and marijuana at birth.

96.     Jackson B. is enrolled in Medicaid.

97.     Jackson B. has experienced multiple forms of trauma, including neglect and being born addicted to crystal methamphetamine.

98.     Even though Jackson B. was born addicted to methamphetamine and his exposure to drugs was the reason he was brought into custody, Jackson B. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Nor has he received appropriate medical services to diagnose, treat, and monitor his health issues, including severe asthma and respiratory issues.

99.     Despite his young age, Jackson B. has already been cycled through three placements. Jackson B. was initially placed at a foster home with his two older brothers, Matty B. and Justin B. Due to the failure to secure mental and behavioral health services for his brothers they were removed from the foster home and Jackson B. was separated from his siblings in August 2017. Due to CYFD's failure to provide transportation assistance, Jackson B. did not have consistent family

visitation with his parents or brothers. In October 2017, Jackson B. was transferred to a new foster placement. CYFD failed to provide proper support, training, and information to the new foster family, who, as a result, hindered reunification efforts. Seven months later, on April 25, 2018, Jackson B. was removed from this placement on an emergency basis and sent back to his first foster mother in Estancia.

100.    Jackson B. brings this action through his Next Friend Gabrielle Valdez.

101.    **Plaintiff Lucas M.** is a white five-year-old from Bernalillo County. Lucas M. and his brother Julian M. entered CYFD custody in April 2018 due to neglect and domestic violence. His father abuses alcohol and his mother recently began abusing methamphetamines. Lucas M. likes to do gymnastics every week with his brother, Julian M., and play with dogs.

102.    Lucas M. is enrolled in Medicaid.

103.    Lucas M. has experienced multiple forms of trauma, including witnessing his father kick and beat his mother and being neglected and separated from a caregiver.

104.    As a result of repeated and sustained trauma, Lucas M. sometimes experiences behavioral challenges, including having difficulty planning, focusing, and regulating his emotions, especially after he sees his mother. When Lucas M. sees his mother and father, he manifests regressive behavior by, for example, insisting that his parents feed him. When Lucas M. entered CYFD custody, he insisted on sleeping in the same bed as his nine-year-old brother.  Only recently did his foster placement transition him into a bunk bed with his brother.  Plaintiff Lucas M. also has a severe speech impediment.

105.    Despite his exposure to repeated and sustained trauma and his severe speech impediment, Lucas M. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Lucas M. has still not received

an EPSDT screening or a neuropsychological evaluation after being in CYFD custody for over three months. Before Lucas M. entered CYFD custody, he was receiving speech therapy during the school year through his preschool. Even though Lucas M. has a severe speech impediment and his mother notified CYFD of the impediment the day he was taken into custody, Lucas M. did not receive a referral to a speech therapist when the school year ended until his Guardian ad Litem advocated for one. Lucas M. did not have an intake appointment with a psychotherapist until he had been in custody for over two months. He has received only one session of therapy, which was a session of talk therapy with his brother and his foster mother in which neither Lucas M. nor his brother felt comfortable speaking.  At the request of his foster parent and Guardian ad Litem, Lucas M. recently had two play therapy sessions.  CYFD did not schedule the intake; the foster parent sought out play therapy on her own.

106.    CYFD has cycled Lucas M. through three placements since he entered custody. CYFD first placed Lucas M. and his brother in a non-relative foster placement for almost five weeks until it found a relative foster placement. CYFD placed Lucas M. and his brother with their aunt, the relative foster placement, for only two weeks. The aunt was not provided with any supports from CYFD and eventually felt she could not handle fostering Julian M. and Lucas M. in addition to supporting her son with special needs who lived with her. CYFD then placed Julian M. and Lucas M. with a fictive kin.

107.    Lucas M. brings this action through his Next Friend Mariel Willow.

108.    **Plaintiff Julian M.** is a white nine-year-old from Bernalillo County. Julian M. and his brother Lucas M. entered CYFD custody in April 2018 due to neglect and domestic violence. His father abuses alcohol and his mother recently began abusing methamphetamines. Julian M. likes to ride his bike, do gymnastics, and play with dogs.

33

109.    Julian M. is enrolled in Medicaid.

110.    Julian M. has experienced multiple forms of trauma, including witnessing his father kick and beat his mother and being neglected and separated from a caregiver.

111.    As a result of repeated and sustained trauma, Julian M. sometimes experiences behavioral challenges, including outbursts. Julian M. has difficulty regulating his emotions, planning and making decisions. Julian M. has extreme difficulty trusting others, especially adults. He is very protective of his mother and younger brother, Lucas M.

112.    Despite his exposure to repeated and sustained trauma, Julian M. has not received adequate medical, mental, and behavioral health services to which he is entitled through Medicaid while in CYFD custody. Julian M. has still not received an EPSDT screening or a neuropsychological evaluation after being in CYFD custody for over three months. Julian M. did not have an intake appointment with a therapist until he had been in custody for over two months. He has only had one session with the therapist, a session of talk therapy with the foster mom and Lucas M. in which the boys barely spoke. At the request of his foster parent and Guardian ad Litem, Julian M. recently had two play therapy sessions.  CYFD did not schedule the intake; the foster parent sought out play therapy on her own.

113.    CYFD has cycled Julian M. through three placements since he entered state custody. CYFD first placed Julian M. and his brother in a non-relative foster placement for almost five weeks until it found a relative foster placement. CYFD placed Julian M. and his brother with their aunt, the relative foster placement, for only two weeks. The aunt was not provided with any supports from CYFD and eventually felt she could not handle fostering Julian M. and Lucas M. in addition to supporting her son with special needs who lived with her. CYFD then placed Julian M. and Lucas M. with a fictive kin.

34

114.    Julian M. brings this action through his Next Friend Mariel Willow.

115.    **Plaintiff David G.** is a white eleven-year-old from Grant County. He entered CYFD custody in 2016. David G.'s mother is currently incarcerated and his father is currently homeless. David G. entered CYFD custody when, following his mother's incarceration, his grandmother asked that he be removed from her care and placed in CYFD custody.

116.    David G. is enrolled in Medicaid.

117.    David G. has experienced multiple forms of trauma, including physical, sexual, and emotional abuse, neglect, losing a sibling to suicide, the incarceration of a parent, the incarceration of a sibling, chronic homelessness, and separation from a caregiver. David G. witnessed his mother's involvement in the sex trade and was included in the background of her advertisements for sexual services and homemade pornographic movies. David G. and his siblings were routinely locked for long periods of time in the bathroom while his mother sold drugs or entertained clients in their home. One of David G.'s older brothers committed suicide by hanging himself from a tree in the family's front yard. Another of his brothers is currently incarcerated. David G. is currently separated from his younger brother, who is staying with the children's grandmother.

118.    As a result of sustained and repeated exposure to trauma, David G. experiences behavioral challenges, including outbursts, impulsivity, and irritability. David G. has difficulty planning, making decisions, focusing, regulating emotions, interpreting communication and cues from others, and maintaining mutual conversations or social interactions. He lacks age-appropriate behavioral controls and age-appropriate judgment. David G. cannot sleep without medication and often cannot manage hygiene when his behaviors are not properly addressed. He perseverates in thinking about his older brother's suicide and his inability to care for his younger brother now that they are separated. Sometimes, David G. worries so much about his younger

brother's safety and well-being that he fears that, like his older brother, he may have committed

suicide. David G. also ruminates on his inability to have prevented his mother's involvement in the

drug and sex trades. David G. often feels overwhelmingly abandoned, alone, and misunderstood.

He sometimes self-harms by vigorously rubbing his knuckles against his jeans until his knuckles

are raw. David G. also has a tendency to feel isolated and when there is no one with whom he can

speak, his feelings of abandonment and emotional dysregulation increase.

119.    Despite diagnoses and exposure to repeated and sustained trauma, David G. has not

received adequate medical, mental, and behavioral health services which he is entitled to through

Medicaid while in CYFD custody. David G. did not receive an appropriate psychological exam

or Medicaid care coordinator until he had been in custody for nearly two years. Although there are

mental health providers in his area, none have been made available to him, and the next closest

provider, to which CYFD failed to send him, is a two-hour drive away. Under CYFD custody and

HSD's supervision of Medicaid, David G.'s Medicaid managed care organization, Blue Cross Blue

Shield, did not assign him a Medicaid care coordinator until 2018, after David G. had been in

CYFD custody for almost two years.

120.    David G. also has not received the adequate mental or behavioral therapy or

medication management to which he is entitled through Medicaid while in CYFD custody.

He received no therapy at all during his first three placements. In subsequent treatment foster care

placements, David G. received inadequate therapy, was repeatedly mis-medicated, and has suffered

severe adverse responses to the medication he has been prescribed. In a treatment foster care

placement, David G. was administered an anti-depressant which caused him symptoms suggesting

a diagnosis of bipolar disorder, including anger, irritability, and outbursts, as well as feelings and

expressions of hopelessness, being unloved, and being abandoned. David G. was not provided a

comprehensive psychological examination and the medication was not discontinued. As a result, David G. had an outburst and was sent to the emergency room overnight, where he received no therapy or acute services. The next day, David G. was placed in an acute care unit at the University of New Mexico, where he was taken off the medication and his behavior rapidly improved and stabilized. David G. was then sent back to the same treatment foster care, where he was assigned to an even less-experienced therapist and put back on the same anti-depressant that had caused the previously observed adverse symptoms. Within hours of being administered the medication, David G. had an outburst and was taken by police back to the emergency room.

121.    CYFD has cycled David G. through at least nine placements in his less than two years in CYFD custody, including at least three regular foster placements, at least three treatment foster care placements, multiple emergency rooms, and a residential treatment center. Due to the lack of a stable placement and appropriate medical, mental, and behavioral health services David G. has received while in CYFD custody, his health and behavior have notably deteriorated, resulting in increasingly restrictive placements. David G. was initially placed with foster parents and received no mental health support. He was then sent to treatment foster care placements where he was mis-medicated and twice transferred to the emergency room. On the second occasion, David G. remained in the emergency room for almost a week because no shelter, treatment foster care, or residential treatment placements were available. David G. was then placed in a foster home, the only placement available, which was already over capacity and lacked the ability to meet David G.'s mental health and behavioral needs. David G. stayed in this placement for less than a week, was transferred to another emergency placement for only a few days, and then was transferred to a residential treatment facility, which was the only available placement in the states of New Mexico, Texas, and Arizona. In this placement, David G. has been and continues to

be repeatedly restrained by the staff of the residential treatment center; he was restrained thirteen of his first fourteen days in the placement. Despite knowledge of these incidents, CYFD has not changed David G.'s placement.

122.   By cycling David G. through numerous facilities and failing to provide any discharge planning or involve his Medicaid managed care coordinator, CYFD and HSD have prevented David G. from receiving consistent care or forming a stable relationship with a therapist, doctor, or foster parent. In addition, due to the deterioration of David G.'s health and behaviors while in CYFD custody, CYFD did not find a school or educational program placement for David.

123.   David G. brings this action through his Next Friend Heidi Todacheene.

124.   **Plaintiff Disability Rights New Mexico** ("DRNM") is a 501(c)(3) non-profit New Mexico corporation, designated as New Mexico's protection and advocacy organization ("P&A"), whose mission is to protect, promote, and expand the rights of persons with disabilities. DRNM is part of a nationwide network of disability rights agencies established by Congress in 1975 and has provided advocacy services to New Mexicans with disabilities since 1979. The Developmental Disabilities Assistance and Bill of Rights Act, the original legislation establishing the P&A systems, authorizes P&As to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the state who are or who may be eligible for treatment, services, or habilitation."[9]

---

[9] 42 U.S.C. § 15043(a)(2)(A)(i) (2004). Several other pieces of enabling legislation authorize similar activities. *See, e.g.*, Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801–10827 (1986) (charging P&As with the duty to protect and advocate for the rights of people with mental illness); Protection and Advocacy for Individuals with Traumatic Brain Injury ("PATBI"), 42 U.S.C. § 300d-53 (2014) (advocating for individuals with traumatic brain injury (TBI) and their families), Protection and Advocacy of Individual Rights Act ("PAIR"), 29

125. DRNM's constituency includes children and adults with mental illness, intellectual and developmental disabilities, traumatic brain injuries, and other disabilities. Particular to this case, the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI")[10] charges P&As in each state with the duty to protect and advocate for the rights of people with mental illness. When enacting the law, Congress specifically found that "individuals with mental illness are subject to neglect, including lack of treatment . . . health care and discharge planning." 42 U.S.C. § 10801(a)(3). Congress further found that state systems for monitoring the rights of individuals with mental illness are varied and often inadequate. *Id.* at (a)(4).

126. Recognizing the vulnerability of individuals with mental illness, Congress authorized DRNM to "protect and advocate the rights of such individuals through activities to ensure the enforcement of the constitution and federal and state statutes."[11] Children involved in the child welfare system by definition have experienced trauma leading to behavioral and mental health diagnoses. These children have a right to appropriate and timely screening and treatment for behavioral and mental health disorders as well as physical health care needs. Children with mental impairments are entitled to an avenue to secure these vital health care services.

127. DRNM has the authority to pursue strategies to secure medically necessary mental and physical health care for children in custody with behavioral health diagnoses. DRNM provides individual advocacy services to children whose foster parents or guardians ad litem have had difficulty getting appropriate health care, most particularly behavioral health care. DRNM also

---

U.S.C. § 794e (2014) (advocating for individuals with disabilities who are not eligible for other protection and advocacy programs).
[10] 42 U.S.C. §§ 10801–10827 (1986).
[11] 42 U.S.C. § 10801(b)(2)(A) (1991).

provides support and technical assistance to attorneys serving children and youth in the child welfare system.

128.     **Plaintiff Native American Disability Law Center** ("NADLC") is a 501(c)(3) nonprofit organization based in Farmington, New Mexico. NADLC advocates for the legal rights of Native Americans with disabilities. Like DRNM, NADLC is a protection and advocacy organization authorized by relevant federal statutes to initiate legal action designed to protect the rights of persons with disabilities, including children in the foster care system. *See* 42 U.S.C. §§ 15041 *et seq.*, 10801 *et seq.* NADLC's mission is to advocate so that the rights of Native Americans with disabilities in the Four Corners area are enforced, strengthened, and brought in harmony with their communities. NADLC represents Native American children with disabilities in the child welfare system as Guardians ad Litem and Youth Attorneys.

129.     NADLC is required to expend significantly more resources to represent children in the child welfare system when CYFD and HSD fail to appropriately place children, subject children to repeated changes of placements, and fail to provide caregivers and children with necessary Medicaid services. The allocation of resources necessary due to these failures diverts NADLC from providing other essential legal services to Native Americans with disabilities.

       **B.          Defendants**

130.     Defendants include state officials from the two state agencies responsible for administering and supervising the child welfare system and Medicaid services to eligible children. CYFD is responsible for "administering and supervising" New Mexico's child welfare services. § 8.8.2.8(A) NMAC. HSD has the authority to "establish, administer and supervise child welfare activities and social services to children," NMSA 1978, § 9-8-13(A)(1), and is the single state

agency designated to administer New Mexico's Medicaid program. 8.291.400.9 NMAC, 42 U.S.C. § 1396a(a)(5).[12]

131.     Defendant **Monique Jacobson** is the Cabinet Secretary of the New Mexico Children, Youth, and Families Department. As such, she is responsible for administering child welfare services in New Mexico, including ensuring CYFD meets it obligations to license and monitor appropriate placements for children in the child welfare system; provide for the care, protection and wholesome mental and physical development of children in state custody; and ensure a coordinated and integrated system of care and services for children, youth, and families. The CYFD Secretary retains "final decision-making authority and responsibility for the administration of any such laws as provided in Subsection B of Section 7 of the Children, Youth and Families Department Act." NMSA 1978, § 9-2A-9.

132.     Defendant **Brent Earnest** is Secretary of the New Mexico Human Services Department. As such, "[i]t is his duty to manage all operations of the department," "enforce the laws with which he or the department is charged," and exercise "general supervisory and appointing authority over all department employees." NMSA 1978, §§ 9-8-6(A), 9-8-6(B)(1). The Social Services Division of HSD establishes, administers and supervises child welfare activities. *Id.* §§ 9-8-6(A), 9-8-13(A). The Medical Assistance Division of HSD administers New Mexico's Medicaid program. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10 (2013); NMSA 1978, §§ 9-8-12, 27-2-16. Earnest is also Secretary Co-chair of the Behavioral Health Collaborative. The collaborative is responsible for (1) "[c]omprehensive planning and meeting state and federal requirements";

---

[12] All references herein to CYFD reference Defendant Jacobson her official capacity at CYFD, not against CYFD as an entity, and all references to HSD reference Defendant Earnest in his official capacity at HSD, not against HSD as an entity.

(2) "[c]reating a single behavioral health care and services delivery system that promotes mental health, emphasizes prevention, early intervention, resiliency, recovery and rehabilitation"; and (3) "[m]onitoring service capacities and utilization in order to achieve desired performance measures and outcomes."[13]

133.    At all times hereto, Defendants were acting under color of state law.

## JURISDICTION AND VENUE

134.    The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States. This Court has personal jurisdiction over Defendants because the individual defendants are domiciled in this district and because Defendants' acts and omissions took place within this district.

135.    Venue is proper in this federal district pursuant to 28 U.S.C. § 1391(b), (c).

## CLASS ALLEGATIONS

136.    Plaintiffs seek injunctive relief applicable to members of the Plaintiff Class and Subclass as defined below. The requirements of Federal Rule of Civil Procedure 23(a) and (b)(2), are met with respect to the classes defined below.

137.    The plaintiff class ("Plaintiff Class") is defined as a statewide class of children and young people who are in the legal custody of the Children, Youth and Families Department and who have experienced or are at significant risk of experiencing complex trauma that substantially limits major life activities. The class includes, but is not limited to, children with trauma-related conditions recognized by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition

---

[13] NMSA 1978, § 9-7-6.4; New Mexico Human Services Department, Medical Assistance Division, http://www.hsd.state.nm.us/behavioral-health-collaborative.aspx (last visited July 18, 2018).

(DSM-5), including post-traumatic stress, anxiety, dissociative, conduct, depressive, and substance-related and addictive disorders.

138.    A sub-class of individuals ("Sub-Class") is defined as individuals in the above-named Plaintiff Class who also qualify for protections under the Indian Child Welfare Act.

139.    There exist questions of law and/or fact common to the Plaintiff Class and Sub-Class (collectively, the "Classes") that predominate over any individual question. Common questions of fact and law include, without limitation:

- Whether Defendants have a system in place that provides children impacted by trauma in state custody with placements and services that are the most appropriate and least restrictive, as required by law;

- Whether Defendants have a system in place that adequately and timely screens children in their custody for medical, mental health, and behavioral needs, as required by law;

- Whether Defendants have a system in place that ensures provision and coordination of medical, mental health, and behavioral health services, as required by law;

- Whether any of Defendants' alleged policies or practices violate plaintiffs' substantive due process rights under the Fourteenth Amendment of the U.S. Constitution, the Rehabilitation Act, the Americans with Disabilities Act, the Medicaid Act, and/or the Indian Child Welfare Act.

140.    The Classes are so numerous that joinder of all members is impracticable. According to the most recent available data, the total number of children who had spent time in foster care in fiscal year 2017 in New Mexico was 4,737.[14]

---

[14] CYFD, FY 2018 Annual Report and Strategic Plan 13 (2018), https://cyfd.org/docs/fy18_annual_report_v2-3.pdf.

141.     The dispersed and changing geographic location of members of the Classes also makes joinder impracticable. Due to CYFD's placement practices, members of the Classes are placed in multiple states and are frequently forced to change placements.

142.     The claims of all the named individual Plaintiffs are typical of the claims of members of the Classes. The claims of Diana D. are typical of the claims of claims of members of the Sub-class. Each Plaintiff is a member of the class he or she seeks to represent. Plaintiffs and members of the Classes have all experienced complex trauma that substantially limits major life activities, such as eating, sleeping, concentrating, thinking, communicating, learning, emotional self-regulation, setting goals, and long-term planning, and major bodily functions of the brain, neurological, and endocrine systems. As a result of Defendants' acts, omissions, policies, and practices that apply to Plaintiffs and the Classes, Plaintiffs and members of the Classes are denied meaningful access to the benefits of New Mexico's child welfare system.

143.     Plaintiffs and their Next Friends will fairly and adequately protect the interests of the Classes. The Plaintiffs are represented by experienced counsel who will adequately represent the interests of the Classes.

144.     Defendants have acted and refused to act and continue to do so on grounds generally applicable to the Classes that Plaintiffs represent, thereby rendering appropriate injunctive and declaratory relief for the Classes as a whole.

## FACTUAL ALLEGATIONS

**I.     CYFD AND HSD ARE RESPONSIBLE FOR NEW MEXICO'S SYSTEM OF CHILD WELFARE AND DELIVERY OF MEDICAL, MENTAL HEALTH, AND BEHAVIORAL HEALTH SERVICES.**

**A.          CYFD's Duty to Administer New Mexico's Child Welfare System**

145.   New Mexico has established a system of child welfare to prevent the abuse, abandonment, or neglect of children and to ensure that youth in state custody have safe and permanent homes and that their well-being is promoted. This system reflects the *parens patriae* principle that state government has a paramount interest in ensuring the protection of children.

146.   CYFD is the child welfare agency responsible for child protective services in New Mexico, and its duties are laid out in detail in Articles 1 and 4 of the New Mexico's Children's Code. Among other obligations, state law identifies CYFD as the state agency responsible for executing the following duties to protect the safety and welfare of New Mexico's children:

- receiving and investigating reports of child abuse and neglect, NMSA 1978, §§ 32A-4-3, -4, and initiating court proceedings to remove children from their homes when necessary to ensure a child's safety, *see* 10 N.M. Reg. 311;

- serving as the legal custodian for children who are removed from their homes, NMSA 1978, §§ 32A-4-7, -16, -18, -22, -25;

- placing children in CYFD custody in appropriate, "community-based" licensed foster homes, approved adoptive homes, certified treatment facilities, shelters, or with relatives, *id.* §§ 32A-1-4(P), 32A-4-8;

- licensing foster homes, certifying treatment facilities and shelters and approving adoptive homes, *id.* §§ 40-7A-1, *et seq.*;

- establishing and making reasonable efforts to implement permanency plans for children in custody, *id.* §§ 32A-4-22(J), -25.1;

- "enact[ing] regulations to control disposition and placement of children under the Children's Code, including regulations to limit or prohibit the out-of-state placement of children,

including those who have developmental disabilities or emotional, neurobiological or behavioral disorders, when in-state alternatives are available," *id.* § 9-2A-8(F);

- "assum[ing] and implement[ing] responsibility for children's mental health and substance abuse services in the state, coordinating with the human services department and the department of health," *id.* § 9-2A-8(H);

- developing and facilitating treatment plans for children in custody, *id.* §§ 32A-4-21, -22, -25;

- developing standards of service within the department that focus on prevention, early intervention, monitoring and outcomes; *id.* §§ 9-2A-8(D), -8(J); and

- "develop[ing] and maintain[ing] a statewide database, including client tracking of services for children, youth and families," *id.* § 9-2A-8(C).

147.    Federal law likewise imposes duties on CYFD to ensure the safety, permanence, and well-being of children in state custody. New Mexico receives federal funding under Title IV-E of the Social Security Act for partial reimbursement of the cost of providing foster care, adoption assistance, and kinship guardianship assistance to children who meet federal eligibility criteria. As a condition of receiving this funding, New Mexico must develop and adhere to a plan that satisfies a number of requirements, including:

- placing each child in foster care in a foster placement that conforms to nationally recommended professional standards, 42 U.S.C. § 671(a)(10);

- providing each child in foster care with quality services to protect his or her safety and health, *id.* § 671(a)(22);

- providing a written case plan for each child that includes (i) a plan to provide safe, appropriate, and stable foster care placements and implementation of that plan, *id.* §§ 671(a)(16),

675(1)(A); (ii) where reunification is not possible or appropriate, a written case plan that ensures the location of an appropriate adoptive or other permanent home for the child and implementation of that plan, *id.* §§ 671(a)(16), 675(1)(E); (iii) a plan to ensure the educational stability of the child while in foster care and implementation of that plan, *id.* §§ 671(a)(16), 675(1)(G); and

- maintaining a case review system in which the status of each child in foster care is reviewed every six months for purposes of determining the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of permanency, *id.* §§ 671(a)(16), 675(5)(B), 675(5)(C).

148.     The Indian Child Welfare Act sets forth steps to be taken to meet the distinct needs of children covered by ICWA who are in the child welfare system. Children in state custody who are covered by ICWA are to be placed in the least restrictive setting that most approximates a family and in which the child's special needs, if any, may be met and "within reasonable proximity to his or her home, taking into account any special needs of the child." 25 U.S.C. § 1915(b). It further requires preference in foster placements to be given to "(i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs." *Id.* ICWA also requires preference in adoptive placements to be given to "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." *Id.* § 1915(a). CYFD must maintain a record of each placement of children covered by ICWA and show evidence of efforts to comply with the order of preferences. *Id.* § 1915(e). CYFD must also make active efforts to provide remedial

services and rehabilitation programs designed to prevent the breakup of Indian families. 25 U.S.C.

§ 1912(d).

**B.      HSD's Medicaid Obligations to Provide a System of Medical, Mental Health, and Behavioral Health Screening and Services**

149.    Medicaid is a federal program enacted in 1965 as part of the Social Security Act. Although a state's participation in the Medicaid program is voluntary, New Mexico has elected to participate and has designated HSD as the state agency responsible for administering the program. NMSA 1978, § 9-8-12; 42 U.S.C. § 1396(a)(5); 42 C.F.R. § 431.10. Once a state elects to participate in the Medicaid program, it must follow program requirements mandated by the federal government. State participants must administer Medicaid in "the best interests of recipients," 42 U.S.C. § 1396a(a)(19), provide services with reasonable promptness, *id.* § 1396a(a)(8), and ensure there is an adequate provider network to deliver those services, *id.* § 1396u-2(b)(5), 42 C.F.R. § 438.68, 8.308.2.9 NMAC.

150.    The child health component of Medicaid, Early Periodic Screening Diagnosis and Treatment ("EPSDT"), was enacted in 1967. The goal of EPSDT was to focus on prevention and early intervention in order to reduce health problems among poor children and offer them equal opportunities for access to health care and healthy lives. All state Medicaid plans are required to provide for "[s]uch other necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services." 42 U.S.C. § 1396d(r)(5).

151.    As a participant in the Medicaid program, New Mexico must provide all Medicaid-eligible persons in the state under the age of 21 with periodic EPSDT screenings that include "a comprehensive health and developmental history (including assessment of both physical and mental

health development),” a comprehensive physical exam, appropriate immunizations, lab tests and health education, 42 U.S.C.§ 1396d(r)(1)(B), as well as assessment of the child’s vision, dental and hearing needs, *id.* § 1396d(r)(2)-(4); *see also* 8.308.9.19 NMAC. New Mexico must further provide and arrange for the treatment services necessary to correct or ameliorate a psychiatric, behavioral, or emotional condition of a Medicaid-eligible child or youth under the age of 21. 42 U.S.C. § 1396d(a). Among the intensive home and community-based services that the state is obligated to provide are: home health care services, *id.* § 1396d(a)(7), rehabilitative services, *id.* § 1396d(a)(13), case management services, *id.* §§ 1396d(a)(19), 1396n(g); and personal care services, *id.* § 1396d(a)(24); *see* 8.308.9.19 NMAC, 8.321.2.11(B)(4(c) NMAC, 8.321.2.16(B)(3)(c) NMAC. EPSDT services include all behavioral and mental health Medicaid-covered services that are medically necessary for children.[15]

152.   EPSDT treatment services must be timely, individualized, and consistent with accepted medical standards. Services must be initiated within six months from the date of request. 42 C.F.R. § 441.56(e).

153.   In order to provide these required services, “[t]he [Medicaid] agency must make available a variety of individual and group providers qualified and willing to provide EPSDT services.” 42 C.F.R. § 441.61(b). While states may adopt managed care, contract with entities to

---

[15] 42 U.S.C. § 1396d(r)(5).  Consistent with federal Medicaid law, the New Mexico Children’s Code defines medically necessary services as: “clinical and rehabilitative physical, mental or behavioral health services that are: (1) essential to prevent, diagnose or treat medical conditions or are essential to enable the child to attain, maintain or regain functional capacity; (2) delivered in the amount, duration, scope and setting that is clinically appropriate to the specific physical, mental and behavioral health care needs of the child; (3) provided within professionally accepted standards of practice and national guidelines; and (4) required to meet the physical, mental and behavioral health needs of the child and are not primarily for the convenience of the child, provider or payer[.]” See NMSA 1978, § 32A-6A-4(T).

oversee the delivery of services and arrange services through provider networks, states retain responsibility for ensuring compliance with all relevant Medicaid requirements, including the mandates of the EPSDT program. 42 U.S.C. § 1396u-2.

## II.   NEW MEXICO FOSTER CHILDREN ARE IMPACTED BY COMPLEX TRAUMA.

### A.      New Mexico Foster Children's Exposure to Trauma

154.   New Mexico foster children have experienced and continue to experience traumatic events that profoundly affect their psychological, emotional, and physical well-being. At a minimum, children in New Mexico's foster system have experienced childhood abuse, abandonment, or neglect. In particular, they may experience physical, emotional, or sexual abuse; emotional or physical neglect; homelessness; the death, incarceration, or deportation of a parent; domestic violence; parental substance abuse, mental illness, or involvement in sex work. For children in the child welfare system, research confirms that the experience of abuse, abandonment, neglect, and instability is often compounded by unfair treatment due to their race or ethnicity, sexual orientation or gender identity, as well as extreme poverty and other socioeconomic hardship.

155.   In addition to experiencing abuse, abandonment, and neglect at home, New Mexico foster children have also, by definition, experienced separation from a caregiver upon entering CYFD custody. Separation from a caregiver, even an abusive or neglectful caregiver, is traumatic for a child.[16] A child may experience separation from an abusive or neglectful caregiver as more traumatic than the abuse or neglect itself. The trauma of being separated from one's parental figures is often compounded by the trauma of being separated from one's siblings. The separation of

---

[16] The Nat'l Child Traumatic Stress Network, *Children with Traumatic Separation: Information for Professionals* 2, https://www.nctsn.org/sites/default/files/resources/children_with_traumatic _separation_professionals.pdf.

siblings in foster care is associated with negative adjustment outcomes, including running away and increased behavioral health issues.[17] Due to CYFD's inadequate array of placements and routine cycling of children through multiple placements, the agency often fails to place siblings in the same placement, or even geographical region. Plaintiffs Chris W., Diana D., Olivia L., Matty B., Justin B., Jackson B., Brian J., Elliot J., and Michael J. have all been separated from a sibling who is also in foster care.

156.    Although even a single traumatic experience can impair a child's well-being, for New Mexico foster children, these events do not take place in isolation. New Mexico foster children are subjected to multiple, repeated, and sustained traumatic experiences. As such, they have experienced complex trauma—the exposure to multiple traumatic events, often of an invasive, interpersonal nature and the wide-ranging, long-term impact of this exposure.[18]

157.    Indeed, as catalogued above, each member of the Classes experienced multiple forms of trauma. Plaintiff David G., for example, has experienced multiple forms of trauma, including physical, sexual, and emotional abuse, as well as neglect, losing a sibling to suicide, the incarceration of a parent, the incarceration of a sibling, and homelessness. For example, Plaintiff Diana D. has experienced the traumas of substance abuse and neglect by her mother, sexual abuse by an older brother, homelessness, and consistent bullying at school. Plaintiff Kevin S.'s experience

---

[17] Children's Bureau, Child Welfare Information Gateway, *Sibling Issues in Foster Care and Adoption* 7 (Jan. 2013) (hereinafter "Sibling Issues in Foster Care") , https://www.childwelfare.gov/pubpdfs/siblingissues.pdf (citing Hegar, R. L., & Rosenthal, J. A., *Foster children placed with or separated from siblings: Outcomes based on a national sample*, 33 CHILDREN AND YOUTH SERVICES REVIEW 1245, 1245–53 (2011)).

[18] Bruce D. Perry & Ronnie Pollard, *Homeostasis, Stress, Trauma, and Adaptation: A Neurodevelopmental View of Childhood Trauma*, 7 CHILD ADOLESC. PSYCHIATR. CLIN. N. AM., 33, 36 (1998) (hereinafter "Homeostasis"); The Nat'l Child Traumatic Stress Network, *Effects of Complex Trauma* 1 (hereinafter "Effects of Complex Trauma"), https://www.nctsn.org/what-is-child-trauma/trauma-types/complex-trauma (last visited July 18, 2018).

with trauma includes repeated childhood sexual abuse by his mothers' partners, physical abuse, exposure to domestic violence, and neglect.

### B.      Complex Trauma's Effects on Brain Development, Function, and Neurobiology

158.   Decades of medical research have overwhelmingly established that the brains of children who experience chronic or repeated traumas undergo material changes. These changes demonstrably impair brain functioning and the neurological and endocrine systems. This impairment in turn interferes with the ability to perform daily activities, including eating, sleeping, concentrating, thinking, communicating, learning, emotional-self regulation, setting goals, and long-term planning. These impairments fall squarely within the meaning of "disability" under the Rehabilitation Act and the ADA.

159.   The human brain, especially the developing brain of a child, is plastic and adaptable. This plasticity allows us to meet the challenges, tasks, and situations we encounter in our daily lives. However, when an individual is repeatedly exposed to trauma, the brain becomes over-sensitized to any potential stimulus that might signal a threat. Such a person may perceive ordinary encounters as threatening ones, triggering a reactive "fight or flight" or dissociative mode.[19]

---

[19] Bruce D. Perry et al., *Childhood Trauma, the Neurobiology of Adaptation, and "Use-dependent" Development of the Brain: How "States" Become "Traits,"* 16 INFANT MENT. HEALTH J. 271, 277–79 (1995) (hereinafter "How 'States' Become 'Traits'"), *available at* https://onlinelibrary. wiley.com/doi/pdf/10.1002/1097-0355%28199524%2916%3A4%3C271%3A%3AAID-IMHJ2280160404%3E3.0.CO%3B2-B; Effects of Complex Trauma, *supra* note 18, at 4; *see also* Homeostasis, *supra* note 18, at 45; Lenore C. Terr, *Childhood Traumas: An Outline and Overview*, 148 AM. J. PSYCHIATRY 10, 11 (1991); Judith Herman, *Trauma and Recovery* 33 (2nd ed. 1997); Christina D. Bethell et al., *Adverse Childhood Experiences: Assessing the Impact on Health and School Engagement and the Mitigating Role of Resilience*, 33:12 HEALTH AFFAIRS 2016 (2014) (hereinafter "Adverse Childhood Experiences"), *available at* https://www.healthaffairs.org/doi/full/ 10.1377/hlthaff.2014.0914; Nadine J. Burke et al., *The Impact of Adverse Childhood Experiences on an Urban Pediatric Population*, 35 CHILD ABUSE & NEGLECT 408 (2011) (hereinafter "Impact").

160.    With severe or chronic trauma, "states become traits": the hyper-aroused "fight" state or the detached, dissociative state becomes the brain's new equilibrium. In practice, this means that if a child repeatedly experiences fear, the areas of the brain that control behavior directed by fear can become over-sensitized, and "full-blown response patterns"—such as hyper-arousal or disassociation—can be triggered by seemingly innocuous stimuli.[20] The child might reasonably perceive ordinary questions from therapists or foster parents, sudden physical movements, or disagreements as challenges, triggering hostility or withdrawal. In a child welfare system that is not trauma-sensitive, this child will likely be treated as disruptive and will be removed and taken to another, likely more restrictive, placement.

161.    The wounds inflicted by trauma may be invisible, but they are unmistakably revealed by brain imaging of children exposed to traumatic experiences such as abuse, abandonment, and neglect. The figure below shows abnormal brain development following neglect in early childhood. The CT scan on the left is an image from a healthy three-year-old with an average head size (50th percentile). The CT scan on the right is an image from a three-year-old suffering from extreme neglect. This child's brain is significantly smaller than average (3rd percentile).[21]

---

[20]How 'States' Become 'Traits', *supra* note 19, at 277–79.

[21]*See* Victor G. Carrion & Shane S. Wong, *Can Traumatic Stress Alter the Brain? Understanding the Implications of Early Trauma on Brain Development and Learning*, 51 J. ADOLESC. HEALTH S23– S28 (2012) (hereinafter "Can Stress Alter the Brain?").



162. The effects of unaddressed exposure to complex trauma can have far reaching consequences for the life activities of children and young people. Some of the activities impacted include:

• **Abnormal Sleeping and Eating Patterns.** Children impacted by complex trauma often experience sleep disturbances and eating disorders.[23] Plaintiffs Chris W., Kevin S., Jennifer H., and Olivia L. have abnormal sleeping patterns. Plaintiff Diana D. has been diagnosed with an eating disorder.

• **Impact on Cognition, Learning, and Concentrating.** Trauma affects mental reasoning functions, including reasoning, problem solving, or evaluating cause-and-effect relationships.[24] A child who is exposed to severe or chronic trauma may also become preoccupied with the traumatic events and replay them over and over in her mind, making it harder for her to think, learn, and focus.[25] The difficulty concentrating caused by exposure to trauma can impair a

---

[22] Bruce D. Perry, *Childhood Experience and the Expression of Genetic Potential: What Childhood Neglect Tells Us About Nature and Nurture*, 3 BRAIN & MIND 79, 93 (2002).

[23] Alexandra Cook, PhD et al., *Complex Trauma in Children and Adolescents*, 35 PSYCHIATRIC ANNALS 390, 392 (2005).

[24] Effects of Complex Trauma, *supra* note 18, at 3.

[25] Sheryl Kataoka et al.,*Responding to Students with PTSD in Schools*, 21 CHILD. ADOLESC. PSYCHIATR. CLIN. N AM. 119 (2012) (hereinafter "Responding to Students").

child's ability to process, retain, synthesize, and recall information as well.[26] Plaintiffs Chris W., Jennifer H., Kevin S., Diana D., Brian J., Elliot J., and Olivia L. have difficulty concentrating. Plaintiffs Kevin S., Justin B., Matty B., Brian J. and Elliot J. have been diagnosed with ADHD.

- **Verbal Processing and Communication.** Children impacted by complex trauma often have difficulty communicating their wishes and needs and interpreting cues from others.[27] Plaintiffs Chris W., Kevin S., Jennifer H., Diana D., Olivia L., Matty B., Brian J., and Elliot J. have difficulty communicating with others and interpreting cues from others.

- **Emotional Self-Regulation.** Complex trauma often induces a predictable set of behaviors due to loss of ability to emotionally self-regulate, including aggression, disproportionate reactivity, impulsivity, distractibility, or withdrawal and avoidance. Plaintiffs Chris W., Jennifer H., Kevin S., Diana D., Olivia L., Matty B., Justin B., Elliot J. and Brian J. have difficulty emotionally self-regulating. Plaintiffs Chris W., Jennifer H., Kevin S., and Diana D. have been diagnosed with disorders indicating inhibited emotional self-regulation, including oppositional defiant disorder, intermittent explosive disorder, and disruptive mood dysregulation disorder.

- **Goal-Setting and Long-Term Planning.** Traumatized children also have a more difficult time setting and achieving goals. Children who do not feel safe at their placement, school, or therapy and who are often in a state of hypervigilance tend to "act instead of plan,"[28] focusing

---

[26] Bessel A. Van der Kolk, *Psychological Trauma* 18, 96–98 (American Psychiatric Publishing) (2003). This perceived inability to pay attention is sometimes diagnosed as ADHD, but the root cause is often traumatic experiences suffered by the child. Bruce D. Perry, *Stress, Trauma, and Post-traumatic Stress Disorders in Children: An Introduction*, The Child Trauma Academy 4 (2007), *available at* https://childtrauma.org/wpcontent/uploads/2013/11/PTSD_Caregivers.pdf; Homeostasis, *supra* note 18, at 34, 45.

[27] Alexandra Cook, PhD et al., *supra* note 23, at 392.

[28] Bessel A. Van Der Kolk, *Developmental Trauma Disorder*, 35 PSYCHIATRIC ANNALS 401 (2005), *available at* http://www.traumacenter.org/products/pdf_files/preprint_dev_trauma_disorder.pdf.

only on their immediate surroundings and situation. Consequently, their ability to make plans or decisions, set goals, work toward those goals, and reflect on progress can be compromised.[29] Plaintiffs Chris W., Kevin S., Jennifer H., and Diana D. have difficulty making decisions, setting goals, and long-term planning.

- **Ability to Care for Oneself.** Traumatized children can have difficulty caring for themselves and managing their hygiene. Plaintiff David G. periodically has trouble caring for himself and managing hygiene.

163.    Because the developing brain of a child is plastic and adaptable, widely published and peer-reviewed research shows that trauma-informed, evidence-based treatment, services and supports help children impacted by complex trauma heal, ameliorating the impacts of the condition.

C.    **Trauma Exposure and Adverse Outcomes for New Mexico's Foster Youth**

164.    Because members of the Classes have endured more than one form of trauma, they are more likely to experience significant adverse outcomes.[30]

---

[29] Ray Wolpow et al., *The Heart of Learning and Teaching: Compassion, Resiliency, and Academic Success* 12 (2009) (hereinafter "The Heart of Learning"), available at http://://www.k12.wa.us/ compassionateschoolspubdocs/TheHeartofLearningandTeachingTheHeartofLearningandTeaching.p df; Bruce D. Perry, *Maltreatment and the Developing Child: How Early Childhood Experience Shapes Child and Culture*, The Margaret McCain Lecture Series 3 (2005) (hereinafter "Maltreatment"), available at http://www.lfcc.on.ca/mccain/perry.pdf ("The traumatized child lives in an aroused state, ill-prepared to learn from social, emotional, and other life experiences. She is living in the minute and may not fully appreciate the consequences of her actions.")

[30] *See* Robert Anda et al., *The Enduring Effects of Abuse and Related Adverse Experiences in Childhood: A Convergence of Evidence from Neurobiology and Epidemiology*, 256 EUROPEAN ARCHIVES OF PSYCHIATRY AND CLINICAL NEUROSCIENCE 174 (2006), https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC3232061/pdf/nihms340170.pdf (finding that the risk of adverse outcomes throughout a person's lifespan "in the affective, somatic, substance abuse, memory, sexual, and aggression related domains increased in a graded fashion as the ACE score increased"); *see also* Mark E. Courtney et al., *Midwest Evaluation of the Adult Functioning of Former Foster Youth: Outcomes at Age 26* (2011), https://www.chapinhall.org/sites/default/files/Midwest%20Evaluation_Report_

165.    Failure to address the trauma experienced by foster children has lasting consequences for their health, educational achievement, and economic self-sufficiency. Research shows that foster children have lower educational outcomes and higher rates of unemployment, homelessness, and incarceration than non-foster children. Elementary-aged foster children achieve lower proficiency in English language arts and math than their peers[31] and are twice as likely to be held back in school.[32] School-age foster children are also more likely to face harsh school discipline. 66.8% of former foster children surveyed in Illinois, Iowa, and Wisconsin had been suspended from school, more than double the national sample, and 16.5% had been expelled, almost four times the

---

4_10_12.pdf (longitudinal study showing that rates of homelessness, joblessness, poverty, and incarceration for former foster children well exceed those of peers with no foster care history); Jessica Bartlett et al., *The Impact of a Statewide Trauma-Informed Care Initiative in Child Welfare on the Well-being of Children and Youth with Complex Trauma*, 84 CHILD. AND YOUTH SERVICES REV. 110, 110 (2018), https://www.sciencedirect.com/science/article/pii/S0190740917306370#bb0075 ("While individual child outcomes vary… research shows that the consequences of maltreatment can span multiple developmental domains and include negative alterations to brain structure and functioning, difficulties forming attachments, posttraumatic stress, internalizing and externalizing behaviors, and chronic health problems.").

[31] In California, 40% of students in foster care tested at the lowest two performance levels (below and far below basic) in English language arts. Wendy Wiegmann et al., *The Invisible Achievement Gap: How the Foster Care Experiences of California Public School Students Are Associated with Their Education Outcomes, Part Two* 26, 31 (2014), http://stuartfoundation.org/wp-content/uploads/2016/04/IAGpart2.pdf.

[32] Fifteen percent of foster children in eleventh grade previously stayed in the same grade for more than one year compared to eight percent of non-foster students. Mason Burley & Mina Halpern, *Educational Attainment of Foster Youth: Achievement and Graduation Outcomes for Children in State Care*, Washington State Institute for Public Policy 24 (2001), http://www.wsipp.wa.gov/ReportFile/773/Wsipp_Educational-Attainment-of-Foster-Youth-Achievement-and-Graduation-Outcomes-for-Children-in-State-Care_Full-Report.pdf.

expulsion rate of the general student population.[33] Less than half of foster children received education after high school and less than 3% earned a bachelor's degree.[34]

### III. CYFD AND HSD HAVE FAILED TO ESTABLISH AND MAINTAIN A SYSTEM TO ENSURE STABLE AND APPROPRIATE FOSTER CARE PLACEMENTS.

166. CYFD has failed to establish and maintain a system capable of placing children in stable foster care placements appropriate to their individual needs. First, CYFD has failed to secure an adequate array of placements. As a result, placement decisions are overwhelmingly driven by the vagaries of availability instead of a child's individual medical, mental, and behavioral health needs. Second, CYFD has failed to hire, support and train staff and service providers—including case workers and mental health providers—in sufficient numbers and with appropriate expertise. CYFD is therefore not capable of providing the support and services necessary to making placements healthy, safe, and sustainable. Worse, by cycling children through multiple inappropriate placements, CYFD harms their mental health and well-being, preventing the creation of stable bonds with a caretaker, and interrupting medical, mental health, and behavioral health care.

167. HSD's failure to adequately ensure provision of timely medical, mental health, and behavioral health services for children contributes to CYFD's failed placement practices. As a

---

[33] Mark E. Courtney et al., *Midwest Evaluation of the Adult Functioning of Former Foster Youth: Conditions of Youth Preparing to Leave State Care*, Chapin Hall Center for Children at the University of Chicago 42 (2004) (hereinafter "Adult Functioning of Former Foster Youth"), http://www.tndev.net/mbs/docs/reference/Transitioning_Youth/Midwest_Study_Former_Foster_ Youth.pdf.

[34] The Northwest Foster Care Alumni Study examined the outcomes of 659 adults who were placed in foster care as children in Washington or Oregon. Peter J. Pecora et al., *Improving Family Foster Care: Findings from the Northwest Foster Care Alumni Study*, Casey Family Programs 36 (2005) (hereinafter "Northwest Foster Care Alumni Study"), https://www.casey.org/media/AlumniStudies _NW_Report_FR.pdf.

result, the mental and physical health of children in CYFD custody deteriorates, placements become unsustainable, and children are unnecessarily removed and cycled through progressively more restrictive placements.

### A.           Inadequate and Inappropriate Array of Placements

#### 1.           Numerous and Short-Term Placements

168.    Due to CYFD's systemic failure to secure an adequate array of appropriate placements and services for children in its custody, CYFD routinely cycles children through numerous short-term placements, including the CYFD office and short-term shelters. Placing children in multiple short-term placements devastates their sense of stability. With each removal, children sever ties with classmates, teachers, therapists, service providers, and community members. They must begin forming critical relationships anew, hoping that, but never knowing whether, they will live in their new location long enough to make progress before yet another removal.

169.    CYFD routinely cycles children through a series of emergency shelters that are designed for short term emergency stays and, thus, are not designed to maintain or establish long-term mental health, behavioral health, or medical care. In fact, CYFD rotates children through a series of emergency shelters so frequently that these shelters routinely set up calls with each other to plan how they can transfer children from shelter to shelter.

170.    CYFD routinely places children in these short-term emergency shelters for months at a time. Plaintiffs Chris W., Kevin S., Jennifer H., and Diana D. have been cycled through multiple short-term placements, including the CYFD office, emergency shelters, and acute child psychiatric units. Plaintiff Chris W. was cycled through four placements, including multiple short-term youth shelters in Taos and Albuquerque, within a two-month period.

## 2.      Overly Restrictive Placements

171.    Defendants' have an inadequate array of less-restrictive placements. CYFD therefore routinely places children in residential treatment centers not because of medical necessity, but because no other placement options are available. Residential treatment centers are among the most restrictive placements for children in state custody. Children in state custody have the right to the least restrictive treatment and should only be placed in residential treatment centers if it is medically necessary. Defendants' failure to secure enough placements within New Mexico results in children being sent to out-of-state residential treatment centers. According to CYFD, as of May 2018, 137 New Mexico children were placed in out-of-state residential treatment centers; approximately 24% of those children were foster children in state custody.[35] Plaintiffs Kevin S. and Jennifer H. are currently placed in residential treatment centers in Utah and Missouri, respectively. CYFD does not regularly monitor children once they send them out of the state. Plaintiff Kevin S. was never visited by a CYFD staff member while living in a residential treatment center in Utah for eleven months.

172.    For example, Plaintiff Jennifer H. was removed from her Medicaid treatment foster care in New Mexico and sent to a residential treatment center in Missouri, again paid for by Medicaid. She was moved to a residential treatment center not because her service providers recommended a placement in residential treatment, but because Defendants were unable to identify a single placement in New Mexico that would accept Jennifer H. after she made an allegation of sexual abuse against a foster father. After making this allegation, Jennifer H. was effectively punished by being removed and sent to an out-of-state, more restrictive placement. In addition to

---

[35] CYFD's response to an Inspection of Public Records Act request entitled "Out of State Residential Placement of NM Children and Youth (12/01/17), produced April 12, 2018.

being overly restrictive for Jennifer H., this placement does not provide her with the services her therapist indicated she needed, including an attachment model and trauma-informed services.

### B.  Unsafe and Traumatic Practices, Including Use of Restraint and Seclusion

173.  Defendants routinely deprive children in state custody of their right to be free from the unreasonable use of restraint and seclusion. Restraint and seclusion may be used only if the technique is imposed to ensure physical safety of a resident or staff member. 42 U.S.C. § 290ii(b)(1). Under Defendants' supervision, however, residential treatment centers and treatment foster care providers routinely use restraints and seclusions on children in CYFD custody for prohibited reasons, including for staff convenience, or as coercion, discipline, or retaliation by staff.

174.  Restraint and seclusion are ineffective[36] methods of behavioral control and result in severe physical and psychological harm to children, especially children who have already experienced trauma. Studies have shown that being restrained is a traumatizing experience in and of itself.[37] Those who are secluded reportedly experience higher feelings of stress, vulnerability,

---

[36] Studies have shown that the use of restraint and seclusion intervention leads to an increase in many of the behaviors that those utilizing the intervention hope to eliminate. *See, e.g.*, R.J. Jones & G.D. Timbers, *An analysis of the restraint event and its behavioral effects on clients and staff*, 11 RECLAIMING CHILD. AND YOUTH, 37–41 (2002), *available at* https://eric.ed.gov/?id=EJ646799. Those who experience restraint or seclusion are both more likely to remain in care longer and to be readmitted for care upon release. Alternative behavioral intervention strategies such as collaborative problem solving (CBS), which place an emphasis on directly addressing a child's trauma, have been proven more effective in constructively managing an intensely frustrated child that would otherwise be subject to restraint or seclusion. Andrés Martin et al., *Reduction of Restraint and Seclusion Through Collaborative Problem Solving: A Five-Year Prospective Inpatient Study*, 59 PSYCHIATRIC SERVICES 1406 (2008), *available at* https://www.livesinthebalance.org/sites/default/files/Martin%20 Psychiatric%20Services%202008.pdf.

[37] Kathleen Ferreira, *Promoting Alternatives to the Use of Seclusion and Restraint, Issue Brief #1*, U.S. Dep't of Health & Human Servs., Substance Abuse and Mental Health Services Administration 2 (2010), https://www.samhsa.gov/sites/default/files/topics/trauma_and_violence/ seclusion-restraints-1.pdf .

neglect, fear, rejection, and anger. For those children that have already experienced trauma, the use of restraints can be re-traumatizing.[38]

175.    The use of restraint and seclusion as a behavioral intervention strategy places children at risk of serious physical harm. Personal restraints can subject children to a variety of injuries, including coma, broken bones, bruises, cuts, and facial damage. It can also cause death due to asphyxiation, strangulation, cardiac arrest, blunt trauma, and choking. Plaintiff Kevin S. was repeatedly restrained, often for over an hour at a time. As a result, he appeared at a court hearing with bruised eyes and other facial wounds.

176.    Chemical restraints are similarly dangerous to children's health and yet are routinely used on children in CYFD custody. The powerful psychotropic drugs and sedatives used pose a significant risk to children's physical and mental health, and in some cases can lead to death by drug overdose. For example, staff at one of the largest residential treatment centers in Albuquerque, routinely use or threaten to use "booty juice," a sedative or other psychotropic medications on children when their disruptive behaviors do not threaten the child or another with imminent, serious physical harm.

177.    CYFD has failed to uphold its obligation to ensure that inappropriate restraint and seclusion practices are not used[39] against children in its custody,[40] including children in out-of-state residential treatment centers.[41] It has failed to ensure that the policies and practices of a placement it certifies comply with CYFD regulations, including CYFD regulations on restraints and

---

[38] *Id.*
[39] N.M. Code R. § 7.20.11.24 NMAC; NMSA 1978, § 32A-6A-9.
[40] NMSA 1978, § 32A-4-23(H).
[41] NMSA 1978, § 32A-4-23(C).

seclusion.[42] Furthermore, CYFD has failed to respond appropriately to incident reports it receives each time a child is subjected to restraint or seclusion.[43] Even after CYFD receives incident reports indicating inappropriate restraint or seclusion, it keeps children in the same placements instead of removing them. For example, Plaintiff David G. was restrained 13 out of 14 days at his residential treatment center in Albuquerque, yet he remains in this placement. CYFD received multiple incident reports detailing how Plaintiff Kevin S. had been repeatedly harmed by both staff and other residents and how he had repeatedly been restrained multiple times a week for substantial periods of time, sometimes for an entire hour, by staff. Nevertheless, CYFD kept Kevin S. at this placement for a year. Plaintiff Chris W. was also repeatedly restrained at his residential treatment center.

### C.        Inappropriate Placements for Children Covered by ICWA

178.     CYFD has failed to place children covered by ICWA within its custody in the least restrictive setting that approximates a family. In New Mexico, over 50% of the Native children in CYFD's custody from 2010 to 2016 were cycled through two or more placements.[44] By being pushed from one placement to the next, these children are deprived of a setting that "approximates a family."

179.     Further, though required to by law, CYFD has not put a preference on placing Indian children with a member of their family or with their tribe. "Having enough families to meet the intent of the Indian Child Welfare Act is a big problem," according to the Director of CYFD's

---

[42] N.M. Code R. § 7.20.11.9(B) NMAC.

[43] NMSA 1978, §§ 32A-6A-10(D)–(E).

[44] The Annie E. Casey Foundation, KIDS COUNT data center, *Children in foster care with more than two placements by race and Hispanic origin* (2018), https://datacenter.kidscount.org/data/tables/8823-children-in-foster-care-with-more-than-two-placements-by-race-and-hispanic-origin.

Protective Services Division.[45] CYFD cannot achieve such placement preferences because it has not recruited enough tribe-approved foster parents or families that otherwise meet the placement preference categories.

180.    Governor Martinez conceded that "the state foster care system needs more Native American foster families."[46] She acknowledged that as of 2012, CYFD had sixty-five Indian foster children in its custody in Bernalillo County, yet had only three Native foster families in that county.[47] Further, CYFD only had two Native foster homes to serve the fifty-two Native foster children in San Juan County.[48] Though there were seventy Native foster children in McKinley County, CYFD only had three Native licensed foster homes there in 2012, with another ten homes on the Navajo Reservation.[49] Between 2012 and 2016, the number of Native children in CYFD's custody has increased by almost 42%.[50]

181.    In addition to having inadequate foster placements, ICWA protected children in CYFD's custody are also "often . . . adopted by non-Native families," according to the Director of CYFD's Protective Services Division.[51] Infrequent adoption of Native children by Native families is inconsistent with the intent of ICWA.

---

[45] Dan Frosch, *Focus on Preserving Heritage Can Limit Foster Care for Indians*, N.Y. TIMES (Jan. 26, 2013), https://www.nytimes.com/2013/01/27/us/focus-on-heritage-hinders-foster-care-for-indians.html.

[46] *Governor Susana Martinez: Foster Care System Needs More Native American Foster Families*, New Mexico CYFD (Mar. 28, 2012), https://cyfd.org/news-events/news/governor-susana-martinez-foster-care-system-needs-more-native-american-foster-families/.

[47] *Id*.

[48] *Id*.

[49] *Id*.

[50] The Annie E. Casey Foundation, Kids Count Data Center, *Children in foster care by race and Hispanic origin* (2018), https://datacenter.kidscount.org/data/tables/6246-children-in-foster-care-by-race-and-hispanic-origin.

[51] Frosch, *supra* note 45.

### D.  Inadequate Support and Trainings for Foster Families or Relatives

182.   When CYFD does place children with foster families, rather than at the CYFD office, emergency short-term center, or a restrictive residential treatment center, it fails to provide foster families with the support and trauma-informed trainings necessary to equip the foster parent to care for the child. As a result, foster parents often feel they cannot adequately meet a child's medical, mental health, and behavioral needs and have no choice but to request the child's removal.

183.   For example, due to CYFD's failure to provide the necessary support for Chris W.'s foster parents, his foster parents requested he be removed. As a result, CYFD separated Chris W. from his siblings and cycled him through several short-term placements. Due to CYFD's failures to provide Brian J.'s aunt with sufficient foster parent services, his aunt requested that he be removed on an emergency basis. CYFD separated Brian J. from his siblings and placed him back with his mother, even though his Guardian ad Litem repeatedly expressed that this placement would harm Brian J.'s safety and well-being. While Brian J. was placed with his mother, CYFD again failed to provide the mother with sufficient in-home support, and Brian J. was removed and sent to a shelter within three weeks.

184.   CYFD fails to provide adequate trauma-informed trainings and services even to those foster parents who have explicitly requested them. Plaintiff Olivia L.'s aunt repeatedly requested support services from CYFD but received none. After less than one month, Olivia L.'s aunt requested that her niece be removed. Olivia L. was then cycled through multiple short-term shelters and was raped by two adults at one of those shelters.

### E.  School Disruption and Inappropriate Placements

185.   CYFD's failure to understand the impact of trauma and separation on children is demonstrated by its failure to keep children in their home schools, despite its legal obligations to

maintain school placements. CYFD's placement practices make staying in the same school nearly impossible. In the 2013-14 school year, 26% of children in protective services custody were in more than one school district and 55% experienced one or more withdrawals.[52] Since entering CYFD custody in November 2016, Matty B. has been cycled through five placements and three schools, sometimes changing schools in the middle of the semester. Plaintiff Diana D. has not earned a single high school credit in a year as a result of CYFD cycling her through at least eleven placements in under two years.

186.    Although complex trauma impacts learning, CYFD fails to address children's needs for services and support in school. Even when children have known learning needs, CYFD routinely fails to identify children who need an IEP, notify a child's new school that he or she qualifies for special education services, or ensure that children's IEPs are followed.[53] Plaintiff Justin B. was evaluated for an IEP only after his foster mother urged the school to evaluate him. He qualified for services due to a developmental delay in his fine motor skills and sensory processing. CYFD failed to ensure that Brian J., Elliot J., and Diana D., all of whom have had IEPs for years, were provided IEPs when they changed schools.

## IV.    NEW MEXICO'S SYSTEM OF CHILD WELFARE IS UNDERSTAFFED AND LACKS NECESSARY EXPERTISE.

187.    New Mexico's system of child welfare lacks the capacity to provide necessary support and training to foster children, foster families, and relatives because it is woefully

---

[52] FosterEd New Mexico, *Building Champions for System-Involved Students: FosterEdProgress Update*, FosterEd 3 (Feb. 23, 2018), http://foster-ed.org/wp-content/uploads/2018/02/FosterEd-NM-Progress-Update.pdf"(hereinafter "Building Champions").
[53] The statewide special education participation rate was 13.9 and the rate for protective services involved students was 31.3%. *Id.* at 2.

understaffed, does not have sufficient mental health services capacity and expertise in-house, and fails to properly train and support its staff.

### A.      CYFD's System Lacks Internal Expertise and Does Not Provide Sufficient Staff Trainings or Support

188.    CYFD has recognized the need to appropriately train staff and address the impact of trauma on children and secondary trauma on staff members in particular.[54] Yet it has wholly failed to do so. CYFD does not provide or require its staff to participate in comprehensive, ongoing, in-person trainings on trauma, secondary-trauma, compassion fatigue, or self-care. Rather, CYFD occasionally provides trauma-related trainings, some of which last only one hour, are offered only online, and only to some staff members.[55] CYFD's current trainings are not mandatory and are not available to foster parents, kinship caregivers and birth parents. The core of a trauma-informed child welfare system is ongoing training for the full child welfare workforce, and this core cannot be maintained by occasional, optional one-hour trainings for only a portion of CYFD's staff.

189.    Research has demonstrated that, without appropriate support and training, social workers and other service providers working closely with traumatized children may experience

---

[54] CYFD, Key Quarterly Performance Measures Report, 2d Quarter, Fiscal Year 2018, at 14 (N.M. 2018).

[55] CYFD, 2015 – 2016 Comprehensive Training Plan (Title IV-E, Title IV-B, CAPTA, CFCIP, CBCAP), https://cyfd.org/docs/2015-2016_Comprehensive_Training_Plan.pdf (last visited July 23, 2018).

compassion fatigue,[56] secondary traumatic stress (or "vicarious trauma"), and burnout.[57] Work-related exposure to the trauma of others can manifest in the same symptoms exhibited by those who endured the underlying trauma—including physical distress, fatigue, difficulty sleeping, detachment, numbness, despair, depression, anxiety, increased irritability, intrusive thoughts, social withdrawal, and diminished concentration.[58] In the longer term, unaddressed secondary traumatic stress leads to burnout, "a state of physical, emotional, and mental exhaustion," and increased turnover of service providers.[59] As a result, even dedicated CYFD staff may be less likely to remain in the job for long. At the end of fiscal year 2016, CYFD reported a 29.7 percent turnover rate for protective services workers.[60] In addition to being costly for the system, the turnover that can result from burnout and secondary traumatic stress exacerbates the complex trauma experienced by the children by creating an unstable and unpredictable environment.[61]

### B.       Failure to Employ Sufficient Numbers of Staff

---

[56] Steven Hydon, Marleen Wong, et al., *Preventing Secondary Traumatic Stress in Educators*, 24 Child and Adolescent Psychiatric Clinics of North America 319, 321 (2015); Charles R. Figley, PhD, *Helping that Hurts: Child Welfare Secondary Traumatic Stress Reactions*, CW360: Center for Advanced Studies in Child Welfare 4–5 (2012) (hereinafter "Helping that Hurts"), http://ncwwi.org/files/Incentives__Work_Conditions/Secondary_Trauma__the_CW_Workforce_CW360.pdf.

[57] Bruce D. Perry, *The Cost of Caring: Secondary Traumatic Stress and the Impact of Working with High-Risk Children and Families*, The Child Trauma Academy 10 (2014) (hereinafter "The Cost of Caring"), https://childtrauma.org/wp-content/uploads/2014/01/Cost_of_Caring_Secondary_Traumatic_Stress_Perry_s.pdf.

[58] Hydon et al. *supra* note 56, at 342; The Cost of Caring, *supra* note 57, at 2, 10, 14 (2014); Joyce Dorado & Vicki Zakrzewski, *How to Support Stressed-Out Teachers*, The Greater Good (2013), https://greatergood.berkeley.edu/article/item/how_to_support_stressed_out_teachers.

[59] The Cost of Caring, *supra* note 57, at 10.

[60] State of N.M., Rep. of the Legis. Fin. Comm., 53rd Legis., 1st Sess., vol. 2, at 261 (2017).

[61] Maltreatment, *supra* note 29, at 3 ("It is paramount that we provide environments which are relationally enriched, safe, predictable, and nurturing. Failing this, our conventional therapies are doomed to be ineffective."); How "States" Become "Traits," *supra* note 19, at 271, 291.

190.    The number of personnel employed by Defendant CYFD is insufficient to meet CYFD legal obligations to children in state custody. Experts have established nationally recognized standards for the maximum number of cases to be assigned to a single caseworker while still achieving effective and responsive services. Both the Child Welfare League of America, a coalition of private and public agencies that develops child welfare policies, and the Council on Accreditation (COA), an independent and nonprofit organization that publishes accreditation standards for state welfare agencies, have established that caseloads should not exceed 15 children per caseworker for permanency planners[62] or 12 children per caseworker for investigators.[63] CYFD's caseloads fail to meet these national standards.

191.    CYFD has admitted that high caseloads have resulted in failure to keep children safe from harm, failure to provide appropriate services, and/or failure to promptly identify a permanent placement. For example, although New Mexico law requires that its caseworkers visit each of their children at least once every thirty days, 8.26.2.17 NMAC, as a result of high caseloads, CYFD caseworkers were unable to visit all of the children for whom they were responsible each month.[64] Excessive job vacancy was identified as a cause of CYFD's failure to identify or prevent maltreatment of over 15% of children in CYFD's custody for 12 months or longer.[65] CYFD has

---

[62] Sean Hughes & Suzanne Lay, Child Welfare League of America, *Direct Service Worker's Recommendations for Child Welfare Financing and System Reform* 5 (2012), https://www.cwla.org/wp-content/uploads/2014/05/DirectServiceWEB.pdf; State of N.M., Rep. of the Legis. Fin. Comm., 53rd Legis., 2d Sess., vol. 1, at 37 (2018); Council on Accreditation, Standards for Child and Family Services, sec. 33.12.

[63] State of N.M., Rep. of the Legis. Fin. Comm., 53rd Legis., 2d Sess., vol. 1, at 37. Standards for Child and Family Services, sec. 33.12. The COA also limits caseloads for investigators to no more than 8 new investigations per month. *Id.*

[64] Key Quarterly Performance Measures Report, *supra* note 54, at 13.

[65] *Id.* at 16.

admitted that because of high caseloads, "[w]orkers frequently report that they are often only able to engage in crisis management with families. Caseworkers are not consistently engaging with caregivers and children effectively in order to assess needs, case plan, provide services, and monitor progress."[66] Finally, CYFD reports that "high" caseloads contributed to its failure to attain permanency for 70% of children within 12 months of their entry into CYFD's custody.[67] Research has likewise shown that high caseworker turnover is strongly correlated with children experiencing multiple placements, receiving fewer services, staying in foster care longer, and failing to achieve permanency.

## V. CYFD'S AND HSD'S FAILURE TO ESTABLISH AND MAINTAIN A SYSTEM FOR DELIVERY OF MEDICAL, MENTAL HEALTH, AND BEHAVIORAL HEALTH SERVICES CAUSES CHILDREN'S HEALTH TO DETERIORATE WHILE IN STATE CUSTODY.

192.    CYFD and HSD have failed to put a system in place that would enable them to meet their legal obligation to conduct comprehensive health screenings for children in state custody and to promptly provide necessary and required services. CYFD's and HSD's failure to implement a system of assessment, preventative care, and delivery of necessary and effective home- and community-based services to identify and meet children's needs early in the process has had devastating consequences for the mental health, safety, and well-being of Plaintiffs and members of the Classes.

### A.    CYFD's and HSD's Failure to Adequately Screen for Trauma and Mental and Behavioral Health Needs

193.    When children enter state custody due to allegations of abuse and neglect, CYFD and HSD have no comprehensive, coordinated, or appropriate system for assessing their mental

---

[66] *Id.* at 18; *see also* N.M. Children Youth & Families Dep't 2015–2019 Child and Family Services Plan at 24 (2014).
[67] Key Quarterly Performance Measures Report, *supra* note 54, at 18.

health needs. They routinely fail to conduct appropriate screening for mental health and behavioral health needs, including needs related to the impact of trauma. Although mental and behavioral health screenings should be conducted as soon as a child enters the child welfare system, CYFD and HSD have no system in place for ensuring these screenings occur promptly. The legally mandated comprehensive screening for EPSDT is required to include mental and behavioral health screening, but often only consists of a basic health assessment. Without screening, CYFD and HSD cannot ensure that Plaintiffs and members of the Classes receive support and services that are essential to their health and well-being.

194.    If and when children do receive a screening for mental and behavioral health, the screening is not consistently conducted in a high-quality manner: screenings are not comprehensive, standardized, integrated with other health assessments, and/or conducted by qualified and appropriately trained professionals. CYFD's and HSD's woefully insufficient screenings do not comport with the prevailing standards of care for assessing trauma-impacted youth. The screenings provide insufficient data to allow CYFD and HSD to identify children who need further assessment and intervention, to form the basis for a child's treatment,[68] or to meet an individual child's trauma-related needs and mental, emotional, or behavioral disorders or conditions.

195.    Even if a child receives a proper mental and behavioral health screening under EPSDT, and even if the screening indicates that the child needs a full neuropsychological evaluation, he or she will often wait an entire year to receive the evaluation. Plaintiffs Chris W., Brian J., Elliot J., and Michael J., for example, did not receive the required evaluations until they had been in custody for eleven months or more. Diana D. did not receive a comprehensive mental

---

[68] The social worker assigned to children in CYFD custody must participate in the development of any behavioral health treatment plan. 8.320.2.15(c)(2)(c) NMAC.

or behavioral health evaluation when she entered state custody, and over a year later, is still on a waitlist for a neuropsychological evaluation.

196. CYFD and HSD have no system in place to ensure ongoing monitoring of children's mental and behavioral health needs, including assessment of complex trauma and psychotropic drug prescriptions. Both the Medicaid Act and evidence-based practices for trauma-informed care require screening and monitoring to be repeated, at prescribed intervals and after major events, such as a change in placement. But CYFD and HSD have no system in place for proactively identifying new symptoms, assessing treatment progress, monitoring outcomes, or guiding case progress. Instead, changes to a child's treatment are nearly exclusively made reactively, and typically under crisis circumstances when the manifestations of ineffective and insufficient treatment plans emerge.

197. CYFD and HSD overuse psychotropic drugs, which are not meant to be a long-term treatment, to manage symptoms that escalate as a result of CYFD's failure to provide adequate services. CYFD and HSD lack a system for ongoing monitoring of the use of psychotropic medication to ensure that children are not being over- or mis-medicated.[69] For example, Diana D. was prescribed at least nine different psychiatric medications by at least six different physicians in a one-year period.

**B.** **CYFD's and HSD's Failure to Ensure Delivery of Appropriate and Coordinated Mental and Behavioral Health Services**

---

[69] Children in foster care are more likely to be prescribed psychotropic drugs, some of which carry high-risk side-effects. U.S. Dep't of Health & Human Servs., Center for Medicaid and CHIP Services, Opinion Letter (July 11, 2013). These drugs may be overprescribed in the first instance due to lack of appropriate screening, assessment, and treatment. *Id.* When prescribed, the use of psychotropic drugs should be justified by clinical evidence identified in screenings, mental health assessments, and the child's treatment plan.

198.     CYFD and HSD have failed to implement a system to ensure prompt delivery of appropriate and coordinated behavioral and mental health services to children in state custody. Even if such a system were implemented, CYFD and HSD have failed to ensure that an appropriate and coordinated network of providers exists to deliver sufficient home and community-based mental health services to children in CYFD custody. As a result, many Plaintiffs and members of the Classes are not receiving necessary services, and the services that are delivered are inconsistent and uncoordinated, undermining their efficacy.

199.     Decades of research and clinical experience have established that intensive home and community-based mental and behavioral health services are both successful and cost-effective. They are a necessary treatment method for children with the most severe emotional and behavioral problems. Indeed, in recognition of the superior outcomes achieved by offering home- and community-based care options, New Mexico developed its Medicaid program "to maximize the incentives *to support people in their homes and communities*."[70] Yet despite the state's obligation to ensure an adequate provider network exists to deliver necessary services, *see* 42 U.S.C. § 1396u-2(b)(5); 42 C.F.R. § 438.68, 8.308.2.9 NMAC, intensive home- and community-based mental and behavioral health services are simply unavailable to Plaintiffs and members of the Classes. And despite the requirements that services be delivered with reasonable promptness, even in Albuquerque, the largest city in the state, children requiring access linger on waiting lists for months

---

[70] N.M. Human Servs. Dep't, New Mexico's Centennial Care, A Waiver Request Submitted Under the Authority of Section 1115 of the Social Security Act, Apr. 25, 2012, at 14 (emphasis added) (hereinafter "Waiver Application"), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nm/Centennial-Care/nm-centennial-care-waiver-reg-04252012.pdf.

on end. Members of the Classes placed in rural areas of the state have even less access to necessary services.

200.    Because of the lack of available home- and community-based mental and behavioral health services, many Plaintiffs and members of the Classes receive woefully insufficient services or do not receive these services at all. Services are denied even when screening identifies them as necessary. For example, Jennifer H. was repeatedly denied the targeted analytic behavior therapy and structured peer interactions required by her psychological evaluation. Children living in rural communities outside of major cities have particular difficulty in securing services and appropriate evaluations because of the absence of providers in rural areas.

201.    Further, HSD's system of delivering Medicaid medical, mental health, and behavioral health services does not coordinate among service providers through a wraparound services model. As a result, the limited services available to Plaintiffs are delivered in an inconsistent and uncoordinated manner, seriously undermining their effectiveness. For example, Chris W. received no individual therapy until he had been in CYFD custody for nearly four months and, two years later, still has not received grief counseling after his mother's death. Diana D. received no services at all for her first month in custody and has since gone weeks at a time without any services. Plaintiffs Matty B. and Justin B. did not receive court-ordered family therapy with their parents until they had been in custody for two years.

202.    CYFD also routinely fails to oversee children's discharge from therapy. As a result, children are prematurely discharged from therapy while in CYFD custody, their behavioral challenges return and escalate, and that predictably results in their removal from their placements.

203.     Overly restrictive placements exacerbate the physical, mental, and behavioral health challenges that Plaintiffs and members of the Classes face.[71] As HSD and CYFD have recognized, "residential treatment is a non-evidence based practice and the most costly behavioral health service for children."[72] Placing children in residential facilities is not only ineffective, but also significantly more expensive than providing appropriate home- and community-based care.

## VI.     TRAUMA-SENSITIVE PRACTICES IN SYSTEMS OF CHILD WELFARE ARE EFFECTIVE AND NECESSARY.

204.     In a child welfare system, in which every child has been impacted by trauma, modification of the entire system is not only an effective means to address complex trauma experienced by children, but is essential in order to meaningfully accommodate the effects of trauma.

205.     Child welfare and mental health professionals have developed and implemented evidence-based, trauma-informed child welfare systems that successfully address the impact of trauma on children in foster care.[73] Effective, trauma-informed systems of child welfare share the

---

[71] New Mexico's application stated that children and youth with Serious Emotional Disturbance (SED) were best served using a system of care approach. Waiver Application, *id.* at 18 ("Single services (such as residential treatment or medication) provided in isolation with no linkage to other needed services for severe or complex, chronic behavioral health disorders rarely leads to sustained and stable recovery and wellness. These isolated services can paradoxically exacerbate symptomalogy and increase risk much as an inadequate dosage of antibiotics can greatly increase the danger from infection.")

[72] Results First, *supra* note 6, at 33 (collaboration between New Mexico Legislative Finance Committee, HSD, and CYFD); *see id.* at 1 ("Forty-six percent of the state's children's behavioral health spending in 2015 was for acute out-of-home treatment without evidence of its effectiveness. Greater investment in prevention and early and community-based interventions, emphasizing community-based interventions, is needed to reduce out-of-home treatment and improve outcomes.").

[73] *See* The Nat'l Child Traumatic Stress Network, *Creating Trauma-Informed Systems*, https://www.nctsn.org/trauma-informed-care/creating-trauma-informed-systems (last visited July 18, 2018).

following core elements: (1) trauma-sensitive training for all involved adults; (2) screening for trauma and prompt provision of appropriate, adequate, and coordinated behavioral and mental health services; (3) monitoring a child's health and treatment; (4) ensuring appropriate placements and placement supports; and (5) implementing wraparound services.

206. **Trauma-Sensitivity Training for Child Welfare Workforce and Families.** The core of a trauma-informed child welfare system is ongoing training for staff at all agency levels,[74] including frontline staff, caseworkers, supervisors, administrators, and other staff, as well as foster parents,[75] kinship caregivers and birth parents.[76] Trauma-sensitive training should enable the adult workforce to (1) recognize and understand trauma and its prevalence in the child welfare system, (2) implement proven trauma-focused responses to address the needs of individual children, (3) understand and respond appropriately to their own secondary trauma and (4) know agency policy and procedures supporting trauma-informed care.[77]

207. **Screening for Trauma, Assessing Functional and Mental Health, and Promptly Providing Appropriate, Adequate, and Coordinated Medical, Mental Health, and Behavioral Health Services.** Trauma-informed child welfare systems include a trauma screening, a functional

---

[74] Even though child welfare staff may not be responsible for delivering trauma-informed interventions, they must be able to appropriately assess and refer families to evidenced-based treatment providers and they must be able to assess if interventions being delivered are having positive outcomes. Children's Bureau, U.S. Dep't of Health & Human Servs., *Information Memorandum: Promoting Social and Emotional Well-Being for Children and Youth Receiving Child Welfare Services* 15 (2012), https://www.acf.hhs.gov/sites/default/files/cb/im1204.pdf.

[75] Sibling Issues in Foster Care, *supra* note 17, at 4.

[76] *Id.*

[77] Children's Bureau, U.S. Dep't of Health & Human Servs., *Developing a Trauma-Informed Child Welfare System* 4 (hereinafter "Developing a Trauma Informed Child Welfare System") (2015).

assessment, and a mental health assessment for each child.[78] Screenings and assessments should be performed as soon as a child enters the child welfare system and should be integrated with other comprehensive screenings, including medical screenings.[79] Based on the results of the screenings and assessments, a child must promptly be provided with appropriate, adequate, and coordinated medical, mental health, and behavioral health services.

208.    **Ongoing Monitoring of a Child's Health and Treatment.** After the initial trauma screening, screening should be repeated periodically, such as every six months or after major events such as a change in placement, in order to identify new symptoms and assess treatment progress.[80] Likewise, trauma-informed systems must monitor the use of psychotropic medication to ensure that children are not being over or mis-medicated.

209.    **Ensuring Appropriate Placements and Placement Supports.** Trauma-informed systems also provide children in foster care with *safe, stable, and ultimately permanent placements*. This is necessary because multiple placements are especially harmful to children impacted by complex trauma and disrupt their medical, mental health, and behavioral health treatment, as well as appropriate family contact. Trauma-informed placements also provide children in foster care with the least restrictive placements that meet their individualized medical, mental health, and behavioral health needs. Placement stability should prioritize fewer placements and placements that are closer to the child's original home, school, and community. Services and supports should be provided in a child's own community and within their own culture.[81] Services

---

[78] Susan Ko et al., *Creating Trauma-Informed Systems: Child Welfare, Education, First Responders, Health Care, Juvenile Justice*, 39 PROF. PSYCHOL.: RES. & PRAC. 396, 398 (2008).
[79] Developing a Trauma Informed Child Welfare System, *supra* note 77, at 13.
[80] *Id.* at 7.
[81] *Id.*

and supports should be provided in the family's natural setting and children should not be forced to move to receive a specific type of service.[82]

210.    **Wraparound Services.** A trauma-informed system should effectively ***coordinate among providers*** of medical, mental health, and behavioral health care services through wraparound services. Children and families involved in foster care have complex needs and there are often multiple agencies and caregivers involved in each child's care. The wraparound model addresses this challenge by creating a specific team for each child that includes his or her family, all other providers, as well as other natural supports that the family and youth may identify.[83] The team creates a plan for services together, ensures the provision of services, and adjusts the plan as needed based on the changing needs of a child.[84] The wraparound approach has shown positive effects for child outcomes and expenditure reduction in other states and a New Mexico legislative report has noted the program's efficacy.[85]

## VII.    CYFD AND HSD ARE DELIBERATELY INDIFFERENT TO PLAINTIFFS' RIGHTS.

211.    For decades, Defendants have stood witness to the profound impacts that trauma has on the mental, behavioral, and physical health of New Mexico's foster care children. Current and former CYFD and HSD leaders have repeatedly acknowledged the impact of trauma on the behavioral and mental health of children, especially children in foster care.[86] CYFD leaders have also repeatedly acknowledged that their system is failing to meet the needs of children in its custody,

---

[82] *Id.*

[83] Center for Health Care Strategies, *Making Medicaid Work for Children in Child Welfare: Examples from the Field* 10 (2013), https://www.chcs.org/media/Making_Medicaid_Work.pdf.

[84] *Id.* at 10.

[85] Results First, *supra* note 6, at 30–31.

[86] New Mexico Legislative Finance Committee, HSD, and CYFD, Building A Better Children's Behavioral Health Care System 2, 3 (Jan. 11, 2018) (unpublished PowerPoint presentation).

failing to meet federal standards,[87] deteriorating in performance, and causing devastating harm to foster children.

212.    In addition to making such public statements, CYFD and HSD have repeatedly been placed on notice of the need to address trauma in the child welfare system and the impact of their failure to do so. The Child and Family Services Improvement and Innovation Act (CFSIA) requires states to report on "how health needs identified through screenings will be monitored and treated, including emotional trauma associated with a child's maltreatment and removal from home . . . ." 42 U.S.C. § 622(b)(15)(A)(ii). The media has repeatedly covered CYFD's and HSD's failures and the harms they have caused children.[88] Even though CYFD and HSD have repeatedly acknowledged their failures and have repeatedly been placed on notice of the harms their failures have caused, they have not meaningfully addressed them.

213.    CYFD has also repeatedly acknowledged in its annual reports that it has failed to meet the needs of children in its custody, citing the very deprivations at issue in this complaint, including:

---

[87] Key Quarterly Performance Measures Report, *supra* note 54, at 20.

[88] *See, e.g.*, Ed Williams, *A pattern of failures: Investigation reveals serious abuses within treatment foster care system*, Searchlight New Mexico (May 16, 2018), http://projects.searchlightnm.com/rnm-breaking/treatment-foster-care/; Ed Williams, *From foster care to youth advocate: After passing through more foster homes than he can count, Albuquerque man works to help others*, Searchlight New Mexico, http://projects.searchlightnm.com/rnm-breaking/treatment-foster-care-qna/, (last visited July 18, 2018); Cynthia Miller, *Foster care survivors fight to improve the system*, SANTA FE NEW MEXICAN (July 16, 2016), http://www.santafenewmexican.com/news/local_news/foster-care-survivors-fight-to-improve-the-system/article_1eb904ae-52b6-596e-9af3-304a3d2a8206.html.

- the failure to meet the federal standard regarding placement moves per 1,000 days of foster care for children entering foster care in a twelve-month period due to "the number of available foster families…and the array of services available to meet the needs of foster children";[89]

- that children are "frequently" placed in "short term emergency placements at the time of removal,"[90] including CYFD offices, and the need to "[d]evelop crisis continuum services to avoid overnight stays in CYFD offices"[91];

- regional disparities in stability of placements.[92] For example, compared to the state average of 3.0 placement moves per 1,000 days in care, as of the second quarter of 2018, that average was double or nearly double in several regions, including Chaves (7.3 moves), Colfax/Union (5.9 moves), and Curry (5.8 moves);[93]

- an overall lack of an "array of services available to meet the needs of foster children"[94] and the need "to increase trauma-informed practices in all levels of care"[95] and "to increase capacity to provide wraparound services targeting CYFD-involved youth in or at risk of out-of-home placements";[96]

- the need to reduce protective services worker caseloads, both to "[m]inimize further harm to children and youth" and to reduce the staff turnover rate;[97]

---

[89] Key Quarterly Performance Measures Report, *supra* note 54, at 20.
[90] *Id.*
[91] CYFD, Annual Report and Strategic Plan, Fiscal Year 2017 at 21 (N.M. 2017).
[92] *See generally* Children Youth & Families Dep't Protective Servs., 360 Quarterly State and County Profiles, 2d Quarter, Fiscal Year 2018 (N.M. 2018).
[93] *See id.* at 44, 78, 83.
[94] Key Quarterly Performance Measures Report, *supra* note 54, at 11.
[95] CYFD, Annual Report and Strategic Plan, Fiscal Year 2017 at 21 (N.M. 2017), https://cyfd.org/docs/fy17_annual_report_final.pdf.
[96] *Id.*
[97] *Id.* at 15–16.

- that protective services worker retention is a "key challenge" and requires trainings that "address[] secondary trauma";[98] and

- the need to "[t]ighten financial controls to ensure that funds are monitored and allocated to reduce waste and improve the quality of life of our clients."[99]

214. Defendant Monique Jacobson, CYFD's Cabinet Secretary, acknowledged that children are placed overnight in the CYFD office, stating, "We all agree that should never happen. But the fact of the matter is, it does happen."[100] A year later, Jacobson was quoted about the same issue, stating that, "I can't tell you with confidence that we will always be able to find a placement for a child before the sun sets."[101] In 2017, the *Albuquerque Journal* reported that to address safety concerns associated with children staying overnight at their office, CYFD implemented new safety measures, including having workers "wear devices to call 911 in case of emergency in the office" and "when children spend the night, usually two employees will watch them."[102] Jacobson also acknowledged that the CYFD office is not legally licensed to house children, stating that, "[w]e can't have kids sleep here" and "[i]t's not licensed for that."[103]

---

[98] Key Quarterly Performance Measures Report, *supra* note 54, at 14.
[99] *Id*. at 15.
[100] *Id.*
[101] Colleen Heild, *Some Troubled Kids in NM Have No Place to Go*, ALBUQUERQUE J. (Jan. 29, 2017), https://www.abqjournal.com/938053/some-troubled-kids-have-no-place-to-go.html.
[102] *Id.*
[103] Cynthia Miller, *CYFD Struggles To Create Child Wellness Center Continue*, SANTA FE NEW MEXICAN (Mar. 16, 2017), http://www.santafenewmexican.com/life/family/cyfd-struggles-to-create-child-wellness-centercontinue/article_56d09ec6-ec7d-5d27-ba7c-ccdc19ac5601.html.

215.     CYFD has acknowledged that its performance is deteriorating. In the first quarter of 2012, 17.5% of children in foster care for up to twelve months had three or more placements.[104] In the first quarter of 2017, that number was over 27%.[105]

216.     CYFD and HSD have also acknowledged that trauma-informed wraparound and community-based services are effective and have made it a goal "to increase capacity to provide wraparound services targeting CYFD-involved youth in or at risk of out-of-home placements."[106]

217.     Notwithstanding these deficiencies CYFD has acknowledged, CYFD has failed to spend funds that had been allocated or appropriated for implementation of programs to improve services for children in its custody.[107]

218.     HSD officials have acknowledged that PTSD is the most expensive child behavioral health disorder in New Mexico and that residential treatment centers are the highest cost service for children, making up 22% of the of the state's expenditures on children's behavioral health.[108] Nonetheless, HSD and CYFD continue to ignore early intervention community-based treatments that would prevent delayed, acute intervention from being necessary, save individual children the pain of unaddressed medical, mental health, and behavioral health issues, and save the state money.

## VIII.   THIS ACTION CANNOT BE BROUGHT IN THE CHILDREN'S COURT AND IT DOES NOT INTERFERE WITH THE CHILDREN'S COURT JURISDICTION.

219.     Plaintiffs in this action do not challenge or seek to enjoin the Children's Court's custody determinations. Plaintiffs in particular do not request any relief that would restrain the

---

[104] CYFD Protective Services, 360 Yearly State Fiscal Year 2017, 14 (2017).
[105] *Id.*
[106] 2017 Annual Report and Strategic Plan, *supra* note 95, at 21; Results First, *supra* note 6, at 40.
[107] *See, e.g.,* Dan Boyd, *CYFD Returned $6.6 Million of Budgeted Funds*, ALBUQUERQUE J. (Jan. 10, 2014), https://www.abqjournal.com/334195/cyfd-returned-66-million-of-budgeted-funds.html.
[108] Building A Better Children's Behavioral Health Care System, *supra* note 86, at 3, 4.

ability of the Children's Court to temporarily or permanently remove a child from the custody of parents or guardians. Plaintiffs instead challenge the unlawful systemic practices of CYFD and HSD officials, practices that the Children's Court is incapable of remedying.

220.     The systemic issues alleged in this complaint are ones that cannot be remedied in the Children's Court, either because State law bars the interposition of Plaintiffs' claims in Children's Court or because the systemic nature of the claims and remedies renders the Children's Court an inadequate forum.  These limitations are described in the Affidavit of the Hon. John J. Romero, Senior Judge of the Children's Court Division of the Second Judicial District of New Mexico, attached hereto as Exhibit A and incorporated herein by reference.

221.     "[T]he children's court is only permitted to do what is specifically authorized by the Code." *State of N.M. ex rel. CYFD v. Paul G.*, 2006-NMCA-038, ¶15, 139 N.M. 258 (internal quotation and citation omitted). The Children's Code does not authorize the Children's Court to:

- order CYFD to recruit and license the necessary number of foster care placements in New Mexico;

- require CYFD to secure an adequate array of services for children in its custody;

- mandate that CYFD identify family members or recruit an adequate number of tribe-affiliated or approved foster families for children covered by ICWA;

- assess the appropriate level of CYFD staffing or to order CYFD to employ more caseworkers or other employees;

- order CYFD or HSD to change its policies and practices.

222.   Nor is the Children's Court able to:

- order CYFD to place children, including children covered by ICWA, in less restrictive placements when such placements, because of the Defendants' failures, are unavailable;

- order CYFD or HSD to provide services that they have not made available, including, but not limited to, ICWA-required remedial services and rehabilitation programs designed to prevent the breakup of Indian families;

- remedy CYFD and HSD's failure to put in place processes and services sufficient to provide for the needs of Plaintiffs and similarly situated children and to comply with their obligations under federal law.

223.    Even if these issues were not systemic, CYFD's practices render the Children's Court an inadequate forum to remedy CYFD's failures even in individual cases. This is true for multiple reasons:

- *First*, CYFD routinely engages in emergency placement changes that do not result in advance notice to the Children's Court or to a child's Guardian ad Litem or youth attorney; lacking notice, there is no opportunity to contest the move before it occurs.

- *Second*, even when placement changes are not made on an emergency basis, CYFD attorneys regularly fail to timely file notices of change of placement. As a result, guardians ad litem and youth attorneys do not learn about placement changes until weeks later, when it is too late to advocate against that change in placement without running the risk that such a motion, even if successful, will only uproot the child again, thereby inflicting more trauma.

- *Third*, because there are insufficient quality placements in New Mexico to meet the needs of all children in the foster care system, if and when the Children's Court does order CYFD to alter a specific placement decision, even if that new placement proves adequate for that child, it limits placement options for other children.

224.    The remedies Plaintiffs seek to address CYFD's failures will promote, not interfere with, the Children's Court's ability to exercise its jurisdiction. By requiring CYFD to secure more

placement options, Plaintiffs' requested relief will afford the Children's Court more options and flexibility when it concludes that CYFD has abused its discretion in a particular placement decision. Similarly, remediation of CYFD's inadequate staffing levels will promote, not interfere with, the Children's Court's ability to exercise its jurisdiction under the Children's Code. CYFD's employees play critical roles in the custody adjudication process that is the responsibility of the Children's Court. These staffing shortages necessarily limit the quantity and quality of information that CYFD can gather and provide to the Children's Court in making its custody determinations and thereby directly interfere with the Children's Court's ability to exercise its jurisdiction. Likewise, the training Plaintiffs seek through this action will promote the Children's Court's ability to perform its statutorily authorized functions. When CYFD staff suffer from burnout, exhaustion, and high rates of turnover, they are less able to assist the Children's Court in providing the information that it needs to function effectively.

## **FIRST CAUSE OF ACTION**

### **(Against All Defendants for Violation of Section 504 of the Rehabilitation Act)**

225.    Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

226.    Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity receiving federal financial assistance…." 29 U.S.C. § 794(a).

227.    A "program or activity" includes "all of the operations of a department…of a State." *Id.* § 794(b)(1)(A).

228.     CYFD and HSD receive federal funds and are therefore covered by the Rehabilitation Act.

229.     As children in the custody of the State of New Mexico who have been adjudicated abused, abandoned or neglected, Plaintiffs and members of the Classes are eligible for the public benefit of the New Mexico child welfare system and Medicaid.

230.     For purposes of the Rehabilitation Act, an "individual with a disability" is defined as it is in the Americans with Disabilities Act of 1990 ("ADA"). *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12101 *et seq*.

231.     The definition of "disability" under the ADA is a "physical or mental impairment that substantially limits one or more life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, *eating, sleeping*, walking, standing, lifting, bending, speaking, breathing, *learning, reading, concentrating, thinking, communicating*, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A) (emphasis added).

232.     The effects of complex trauma cause impairment that limits a child's ability to perform major life activities including eating, sleeping, concentrating, thinking, communicating, learning, emotional-self regulation, setting goals, and long-term planning, and major bodily functions of the brain, neurological, and endocrine systems.

233.     Plaintiffs and members of the Classes have experienced complex trauma and its effects, substantially limiting them with regard to eating, sleeping, concentrating, thinking, communicating, learning, emotional-self regulation, setting goals, and long-term planning, and major bodily functions of the brain, neurological, and endocrine systems. Plaintiffs therefore meet the definition of "individuals with disabilities" within the meaning of the Act and are entitled to "meaningful access" to the benefits, services, and programs provided by CYFD and the benefits,

services, and programs established, administered, supervised, and provided for by HSD through its

Medicaid program.

234.     Solely by reason of their exposure to complex trauma and its effects, each of the

Plaintiffs and members of the Classes have been denied meaningful access to the New Mexico child

welfare system. Complex trauma impairs a child's ability to meaningfully access the benefits of the

foster care and Medicaid systems where reasonable accommodations have not been made for

children impacted by complex trauma.

235.     There are effective and reasonable accommodations that Defendants could

implement that would create a trauma-informed child welfare system that would allow Plaintiffs

and members of the Classes to enjoy the benefits of the foster care and Medicaid systems. Examples

include trauma-sensitive training for all staff; screening children for trauma; promptly providing

appropriate, adequate and coordinated medical, behavioral health, and mental health services;

monitoring a child's health and treatment; ensuring appropriate placements and placements

supports; and providing wraparound services.

236.     Defendants have failed to implement reasonable accommodations that would allow

members of the Classes to receive the benefits of the child welfare system offered by Defendants.

237.     Defendants have also engaged in acts or omissions that inflict and exacerbate

complex trauma on children in New Mexico's child welfare system. For example, Defendants have

repeatedly transferred children between placements, many of which are overly restrictive, remote,

and/or utilize inappropriate physical and chemical restraints. These acts can and do create trauma

for children in CYFD's custody who are enrolled in or are eligible for HSD's Medicaid program.

This trauma in turn can result in disabilities that interfere with these children's ability to access

foster care and Medicaid services. CYFD's and HSD's failure to accommodate the very disability they helped facilitate constitutes discrimination on the basis of disability.

238.    Because of these acts and omissions, the Plaintiffs and members of the Classes have been denied the benefits of New Mexico's child welfare and Medicaid systems solely on the basis of their disability.

239.    Plaintiffs and members of Classes are entitled to appropriate relief.

## SECOND CAUSE OF ACTION

### (Against All Defendants for Discrimination Under the Americans with Disabilities Act of 1990)

240.    Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

241.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity." 42 U.S.C. § 12132.

242.    CYFD and HSD are public entities under Title II of the ADA.

243.    As children in the custody of the State of New Mexico who have been adjudicated abused, abandoned or neglected, Plaintiffs and members of the Classes are eligible for the public benefits of the New Mexico child welfare system and New Mexico's Medicaid system.

244.    The definition of "disability" is a "physical or mental impairment that substantially limits one or more life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, *eating, sleeping*, walking, standing, lifting, bending, speaking,

breathing, *learning, reading, concentrating, thinking, communicating*, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A) (emphasis added).

245. The effects of complex trauma cause impairment that limits a child's ability to perform major life activities including eating, sleeping, concentrating, thinking, communicating, learning, emotional-self regulation, setting goals, and long-term planning, and major bodily functions of the brain, neurological, and endocrine systems.

246. Plaintiffs and members of the Classes have experienced complex trauma and its effects, substantially limiting them with regard to eating, sleeping, concentrating, thinking, communicating, learning, emotional-self regulation, setting goals, and long-term planning, and major bodily functions of the brain, neurological, and endocrine systems.

247. Solely by reason of their exposure to complex trauma and its effects, each of the Plaintiffs and members of the Classes have been denied meaningful access to the New Mexico foster care and Medicaid systems. Complex trauma impairs a child's ability to meaningfully access the benefits of the child welfare system where reasonable accommodations have not been made for children impacted by complex trauma.

248. There are effective and reasonable accommodations that Defendants could implement that would create a trauma-informed child welfare system and would allow Plaintiffs and members of the Classes to enjoy the benefits of the child welfare system. Examples include trauma-sensitive training for all staff; screening children for trauma; promptly providing appropriate, adequate and coordinated medical, mental health, and behavioral health services; monitoring a child's health and treatment; ensuring appropriate placements and placements supports; and providing wraparound services.

249.    Defendants have failed to implement reasonable accommodations that would allow members of the Classes to receive the benefits of the child welfare system offered by Defendants.

250.    Defendants have also engaged in acts or omissions that inflict and exacerbate complex trauma on children in New Mexico's child welfare system.

251.    Because of this failure, the Plaintiffs and members of the Classes have been denied the benefits of adequate foster care and Medicaid services solely on the basis of their disability.

252.    Plaintiffs and members of the Classes are entitled to appropriate relief.

### THIRD CAUSE OF ACTION

### (Against All Defendants for Unlawful Segregation Under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act of 1990)

253.    Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

254.    CYFD and HSD receive federal financial assistance.

255.    CYFD and HSD are public entities under title II of the Americans with Disabilities Act.

256.    Complying with the state's Medicaid obligations to provide prompt and adequate screening, treatment, and monitoring of medical, mental, and behavioral health issues is, at minimum, a reasonable modification and indeed is independently required by the Medicaid Act.

257.    Defendants have failed to administer services, programs and activities in the most integrated setting appropriate to the needs of children in CYFD's custody. 28 C.F.R. §35.130(d).

258.    Plaintiffs and members of the Classes have been placed in unduly restrictive settings, despite their ability to benefit more from treatment in a less restrictive setting.

259.     Both Section 504 and the ADA prohibit unjustified segregation of persons with disabilities. *See* 29 U.S.C. § 794; 42 U.S.C. §§ 12101(a)(2), (a)(5). This means that the state must provide appropriate community based treatment services. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999).

260.     Unjustified segregation, in the form of treatment settings that severely limit the exposure of persons to the outside community, constitutes discrimination on the basis of disability. *Id.* at 597.

261.     The segregation of children in the CYFD system into environments that are more restrictive than necessary constitutes discrimination as defined in *Olmstead* under both Section II of the ADA and Section 504 of the Rehabilitation Act.

262.     Defendants have discriminated against Plaintiffs by denying them the opportunity to participate in CYFD's and HSD's foster care and Medicaid programs and services; and aiding and perpetuating discrimination by assisting other Defendant agencies in discriminating against Plaintiffs. 28 C.F.R. § 35.130(b)(1).

263.     Defendants have further discriminated against Plaintiffs in violation of the ADA by utilizing criteria or methods of administration that have the effect of (i) subjecting Plaintiffs to discrimination on the basis of disability; (ii) substantially impairing accomplishment of the objectives of CYFD's foster care program and HSD's Medicaid program; and (iii) perpetuating discrimination by other Defendant agencies subject to common administrative control. 28 C.F.R. § 35.130(b)(3).

264.     Plaintiffs and members of the Classes are entitled to appropriate relief.

## FOURTH CAUSE OF ACTION

### (Against All Defendants for Violation of Substantive Due Process under the 14th Amendment to the United States Constitution)

265.    Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

266.    Defendants have restrained Plaintiffs' personal liberty by taking these minors into state custody, assuming responsibility for their safety and general well-being, and thereby rendering them wholly dependent on Defendants.

267.    Defendants, while acting under color of law, have developed and maintained customs, policies, and practices that deprive children who have experienced complex trauma of their constitutional rights, in violation of 42 U.S.C. § 1983, by failing to provide them with basic needs, including adequate and appropriate medical care and services; conditions of confinement that are reasonably related to the purpose of their custody; reasonable care and safety; and freedom from an unreasonable risk of harm. CYFD's and HSD's practices have caused Plaintiffs' conditions to deteriorate and have subjected them to unsafe conditions and psychological and physical harm, in violation of the Fourteenth Amendment to the United States Constitution. *Whitley v. New Mexico Children, Youth & Families Dep't*, 184 F. Supp. 2d 1146, 1155 (D.N.M. 2001) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)).

268.    As set forth above, Defendants have acted with deliberate indifference towards Plaintiffs. CYFD's and HSD's own statements, and the various publications that have put them on notice, establish that Defendants know of the danger to Plaintiffs. In failing to address Plaintiffs' complex trauma and in taking actions that worsen Plaintiffs' complex trauma, Defendants have abdicated their duty to act professionally and have thereby caused Plaintiffs' injuries.

269.    Plaintiffs and members of the Classes are entitled to appropriate relief.

## FIFTH CAUSE OF ACTION

### (Against All Defendants for Violation of the Medicaid Act, Early and Periodic Screening, Diagnostic and Treatment (EPSDT) Services, 42 U.S.C. § 1396 *et seq.*)

270.    Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

271.    Defendants, while acting under color of law, have developed and maintained customs, polices, and practices that deprive Plaintiffs and members of the Classes of statutory rights, in violation of 42 U.S.C. § 1396 *et seq.* Defendants have failed to provide or otherwise arrange for early screening and diagnostic services that would determine the existence of any physical or mental illnesses or conditions, in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(B), 1396d(a)(4)(B), and 1396d(r)(1)(A). Defendants have failed to arrange for necessary mental and behavioral health services, including intensive, community, and home-based mental health services, that would treat or ameliorate their physical or mental illnesses or conditions, in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C),), 1396d(r)(5).

272.    Plaintiffs and members of the Classes are entitled to appropriate relief.

## SIXTH CAUSE OF ACTION

### (Against All Defendants for Violation of the Medicaid Act, Reasonable Promptness Provision, 42 U.S.C. § 1396a(a)(8)).

273.    Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

274.    The Medicaid Act requires states to provide EPSDT services to Medicaid-eligible children under the age of 21 with "reasonable promptness." 42 U.S.C. § 1396a(a)(8). Defendants have failed to furnish required medical services with reasonable promptness.

93

275.     Plaintiffs and members of the Classes are entitled to appropriate relief.

## SEVENTH CAUSE OF ACTION

### (Against All Defendants for Violation of the Indian Child Welfare Act, U.S.C. § 1915(a) & (b)).

276.     Plaintiffs hereby re-allege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

277.     The Indian Child Welfare Act (ICWA) requires that children covered by ICWA who are in foster care receive placements in a least restrictive setting that approximates a family. 25 U.S.C. § 1915(b). ICWA also requires that covered children receive preferred placements – for both pre-adoption and adoption – in Indian foster homes or settings approved by the Indian child's tribe. 25 U.S.C. § 1915(a), (b).

278.     ICWA defines "Indian child" to mean "any unmarried person who is under the age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Defendants have failed to promptly identify which children in state custody qualify as Indian children for purposes of ICWA.

279.     Defendants have denied Sub-Class members access to the least restrictive setting that approximates a family by pushing a majority of the children in CYFD's custody through multiple placements.

280.     Defendants have failed to have a system of services and supports capable of providing remedial services and rehabilitation programs designed to prevent the breakup of Indian families as required by ICWA. 25 U.S.C. §1912(d)

281.     Defendants have also denied Sub-Class members of the legally preferred pre-adoptive placements by failing to acquire an adequate number of tribe-affiliated or approved foster families, failing to make appropriate efforts to coordinate with tribes to recruit and support placements, and failing to promptly identify family members or appropriate tribal placements.

282.     Defendants have further denied Sub-Class members the legally preferred adoptive placements by too often facilitating the adoption of Indian children by non-Native families.

283.     Plaintiffs and members of the Classes are entitled to appropriate relief.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

1.     A determination by this Court that this action may be maintained as a class action.

2.     Injunctive relief requiring Defendants to implement reasonable accommodations in the form of trauma-sensitive policies and procedures that will allow the members of the Classes an opportunity to meaningfully access the child welfare system, including, but not limited to:

a.          Providing mandatory, ongoing trauma-sensitive training for all health care providers, foster care parents, respondents, Guardians ad litem, Youth Attorneys, and CYFD and HSD staff to enable them to (1) be aware of the prevalence and impact of complex trauma in foster care children, (2) understand and respond appropriately to the needs of individual children impacted by complex trauma, (3) know agency policy and procedures supporting trauma-informed care, (4) create a safe, positive, stable environment in a child's placement, (5) deliver proven trauma interventions that reduce the impact of complex trauma on children and avoid re-traumatization and (6) understand and respond appropriately to their own secondary trauma to reduce workforce burnout and turnover;

b.        Conducting trauma-informed screening for medical, mental health, and behavioral needs and prompt establishment and provision of appropriate, accessible, adequate, and coordinated medical, mental health, and behavioral health services;

c.        Monitoring children's health and treatment, including periodic functional assessments, providing new assessments whenever a child's placement is changed, and monitoring the use of psychotropic medications;

d.        Ensuring children are placed in safe and stable placements that are the least restrictive appropriate to their needs, including, but not limited to, ensuring children are not placed in CYFD offices; prioritizing keeping sibling groups together and keeping children geographically close to their home communities; eliminating the practice of placing children in multiple short-term placements; enhancing permanency placing; and recruiting, training, and supporting an array of appropriate foster placements that meet the individualized behavioral, cultural and mental health needs of children;

e.        Complying with their obligations under ICWA, including acquiring an adequate number of tribe-affiliated or approved foster families, making appropriate efforts to coordinate with tribes to recruit and support placements, promptly identifying children covered by ICWA and family members or appropriate tribal placements, facilitating legally preferred adoptive placements, and providing a system of services and supports capable of providing remedial services and rehabilitation programs designed to prevent the breakup of Indian families,

f.        Establishing and implementing coordinated, statewide individualized services in the least restrictive environment, including but not limited to the provision of intensive community based services and needed wraparound services;

g.          Ensuring CYFD and HSD have sufficient capacity to meet children's medical, mental health, and behavioral needs so that medically necessary services for children are available, appropriate, accessible, individualized and promptly delivered; and

h.          Ensuring CYFD and HSD coordinate in fulfilling their obligations under the law and the prayed relief.

3.     A declaration that Defendants, through their actions and omissions and policies and procedures complained of, violate:

a.          The Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution;

b.          Section 504 of the Rehabilitation Act;

c.          The Americans with Disabilities Act;

d.          Early and Periodic Screening, Diagnostic and Treatment (EPSDT) Services Provisions of the Medicaid Act, 42 U.S.C. § 1396 *et seq.*;

e.          The Reasonable Promptness Provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(8));

f.          The Indian Child Welfare Act, U.S.C. § 1915(b)).

4.     An award of costs and attorney's fees and expenses pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 1988, and any other applicable provisions of law.

5.     Such other relief as this Court deems just and proper.

Dated:  December 28, 2018

*/s/ Mark Rosenbaum*

Mark Rosenbaum
Kathryn Eidmann
**PUBLIC COUNSEL**
610 S. Ardmore Avenue
Los Angeles, CA 90005
Office: (213) 385-2977
Fax: (213) 385-9089
mrosenbaum@publiccounsel.org
keidmann@publiccounsel.org

*/s/ Grant Davis-Denny*

Grant A. Davis-Denny
Jeffrey A. Payne
**MUNGER, TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Office: (213) 683-9100
Fax: (213) 687-3702
grant.davis-denny@mto.com
jeffrey.payne@mto.com

*/s/ Nancy Koenigsberg*

Nancy Koenigsberg
**DISABILITY RIGHTS NEW MEXICO**
3916 JuanTabo NE
Albuquerque, NM 87111
Office: (505) 256-3100
Fax: (505) 256-3184
nkoenigsberg@drnm.org

*/s/ Vincent J. Ward*

Vincent J. Ward
Jeremy D. Farris
**FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD, P.A.**
20 First Plaza, Suite 700
Albuquerque, NM 87102
Office: (505) 842-9960
Fax: (505) 842-0761
vjw@fbdlaw.com
jdf@fbdlaw.com

*/s/ Tara Ford*

Tara Ford
Stanford Law School
**MILLS LEGAL CLINIC**
Youth and Education Law Project
559 Nathan Abbot Way
Stanford, CA 4305-8610
Office: (650) 725-8581
Fax: (650) 723-4426
taraford@law.stanford.edu

*/s/ F. Michael Hart*

F. Michael Hart
Julio C. Romero
Kelly Stout Sanchez
**MARTINEZ, HART, THOMPSON &
SANCHEZ, P.C.**
1801 Rio Grande Blvd NW, Suite A
Albuquerque, NM 87104
Office: (505) 343-1776
Fax: (505) 344-7709
mikeh@osolawfirm.com
kellys@osolawfirm.com

/s/ Sara S. Crecca

Sara S. Crecca
**THE LAW FIRM OF**
**ALEXANDER D. CRECCA, PC**
3200 Monte Vista Blvd NE
Albuquerque, NM 87106
Phone: (505) 766-9999
Fax: (505) 766-9950
saracrecca@creccalaw.com

/s/ Kelly K. Waterfall

Kelly K. Waterfall
**THE LAW OFFICE OF RYAN J. VILLA**
2501 Rio Grand Blvd. NW, Suite A
Albuquerque, NM 87104
Office: (505) 256-7690
Fax: (505) 433-5812
kelly@rjvlawfirm.com

*Attorneys for the Plaintiffs and the Proposed*
*Classes*